JOSEPH TRIGILA *v.* CITY OF HARTFORD
(14117)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and BORDEN, Js.

---

Argued January 11—decision released February 19, 1991

*Patrick L. Kennedy,* for the appellant (plaintiff).

*Richard M. Cosgrove,* senior deputy corporation counsel, for the appellee (defendant).

PETERS, C. J. The only issue in this case is whether a union member may seek judicial relief for a statutory claim of employment discrimination without first availing himself of the grievance procedures established by a collective bargaining agreement. The plaintiff, Joseph Trigila, is a fiscal officer in the department of housing and community development of the defendant city of Hartford. His complaint alleges that, by requiring him to take an unpaid leave of absence during his candidacy for state elective office, the defendant violated the

antidiscrimination provisions of General Statutes § 2-3a.[1] In response, the defendant filed a motion to dismiss for lack of subject matter jurisdiction, premised on the plaintiff's failure to exhaust administrative remedies prescribed in the collective bargaining agreement negotiated between his union and the defendant. The trial court granted the defendant's motion to dismiss and rendered judgment in its favor. The plaintiff appealed to the Appellate Court and we transferred his appeal to this court pursuant to Practice Book § 4023. We affirm the trial court's judgment.

The complaint and the motion to dismiss contain allegations of fact that are undisputed. On July 28, 1988, the plaintiff, as a classified employee of the defendant, was a member of a collective bargaining unit represented by the Hartford Municipal Employees Association, Inc. A collective bargaining agreement[2] between

[1] General Statutes § 2-3a provides: "EMPLOYER NOT TO DISCRIMINATE AGAINST CANDIDATES FOR OR MEMBERS OF THE GENERAL ASSEMBLY. No employer of twenty-five or more persons shall discriminate against, discipline or discharge any employee because such employee is a candidate for the office of representative or senator in the general assembly, or because he is elected to such office, or because he loses time from work in order to perform the duties of such office, provided the failure of such employer to pay wages or salaries for any such time lost shall not be considered a violation of this section. No such employee shall lose any seniority status which may have accrued to him and, where the function of such employee is performed in work shifts, such employee shall be given a choice of shifts. Any employer violating the provisions of this section shall reinstate any employee so discriminated against, disciplined or discharged to his full status as an employee as of the date of such violation and shall pay him any wages withheld or diminished retroactive to the date of such violation. Any employee nominated to such office shall, within thirty days following his nomination, give written notice thereof to his employer."

[2] The plaintiff's union and the defendant entered into one collective bargaining agreement for July 1, 1985, to June 30, 1988, and another for the period July 1, 1988, to June 30, 1991. Although the latter agreement was not approved until January 19, 1989, this delay left the earlier agreement in effect until that time. General Statutes §§ 7-474, 7-475. Because the relevant provisions of the two collective bargaining agreements are identical with respect to the scope of their grievance procedures, we refer to the collective bargaining agreement in the singular.

the plaintiff's union and the defendant provides a grievance procedure for the settlement of disputes concerning its "application, meaning or interpretation." Article II, § 2.1 It also incorporates by reference "all provisions of Federal, State and City laws and ordinances . . . not otherwise specifically superseded by the terms of this Agreement." Article III, § 3.1

Relying on a municipal charter provision forbidding classified city employees from continuing in municipal service while running for political office,[3] the defendant required the plaintiff to take an unpaid leave of absence when he announced his intention to become a candidate for the office of state representative. The plaintiff returned to municipal service on November 14, 1988, after having lost his bid for elective office. Without attempting to invoke the grievance procedures of the collective bargaining agreement, the plaintiff filed the present lawsuit alleging that the defendant's violation of § 2-3a entitled him to recover the wages he lost during the period of his involuntary suspension.

The trial court, in its memorandum of decision, concluded that the plaintiff's claimed right, under § 2-3a,[4] to pursue his electoral campaign without being "discriminate[d] against, discipline[d] or discharge[d]" by the defendant, raised an issue that fell within the terms of the collective bargaining agreement. Accordingly, the court ruled that the agreement's procedures for the administrative resolution of grievances arising out of the employment relationship governed the plaintiff's claim. Because failure to exhaust applicable adminis-

---

[3] The Charter of the city of Hartford is a special act of the General Assembly. 25 Spec. Acts. 1947, No. 30, as amended by 34 Spec. Acts 1969, No. 140. Chapter XVI, § 12, entitled "Prohibited Practices," provides in relevant part: "No officer or employee in the classified service of the city shall continue in such position after becoming a candidate for election to any public office."

[4] The text of General Statutes § 2-3a is set out in footnote 1, supra.

trative remedies deprives a court of subject matter jurisdiction, the court granted the defendant's motion to dismiss the plaintiff's complaint.

The plaintiff's appeal from the judgment of the trial court raises only one narrow issue. He concedes that, if he were pursuing the validity of his unpaid leave as a *contract* claim, he would have had an effective administrative remedy within the terms of the collective bargaining agreement. He maintains, however, that he is entitled to pursue a separate and distinct *statutory* cause of action for a violation of § 2-3a, which is not expressly encompassed by the collective bargaining agreement and for which the grievance procedure provides no specific remedy.

The issue that the plaintiff raises has two analytic subparts. First, as a general matter, do the parties to a collective bargaining agreement have the authority to include the resolution of questions of law relating to statutory construction and application within contractually determined grievance and arbitration procedures? Second, does the collective bargaining agreement in this case manifest the parties' intention to confer such authority on the designated grievance and arbitration procedures? In our view, the answer to both of these questions is yes.

Unions and their employers have broad contractual authority to provide administrative remedies for disputes arising out of the employment relationship. That authority encompasses issues of law as well as of fact. *O & G/O'Connell Joint Venture* v. *Chase Family Limited Partnership No. 3,* 203 Conn. 133, 145–46, 523 A.2d 1271 (1987); *Bridgeport* v. *Bridgeport Police Local 1159,* 183 Conn. 102, 106–107, 438 A.2d 1171 (1981). Before pursuing even alleged violations of state statutory procedures and of constitutional rights to due process and equal protection, "parties to a collective

bargaining agreement must attempt to exhaust the exclusive grievance and arbitration procedures established in their agreement before resorting to court." *School Administrators Assn.* v. *Dow,* 200 Conn. 376, 382, 511 A.2d 1012 (1986); *Cahill* v. *Board of Education,* 198 Conn. 229, 236–39, 502 A.2d 410 (1985). The trial court therefore correctly rejected the plaintiff's contention that the denomination of a claim as statutory automatically authorizes the bypass of collective bargaining procedures.

Although the administrative procedures established by the parties' collective bargaining agreement can provide remedies for many statutory and constitutional claims; but see *Stratford* v. *Local 134, IFPTE,* 201 Conn. 577, 585–86, 519 A.2d 1 (1986); *Carofano* v. *Bridgeport,* 196 Conn. 623, 637–38, 495 A.2d 1011 (1985); *Caldor, Inc.* v. *Thornton,* 191 Conn. 336, 344–45, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985); the legislature can confer upon an employee a substantive statutory right independent of existing labor relations statutes and the administrative procedures associated therewith. In *Shortt* v. *New Milford Police Department,* 212 Conn. 294, 304–305, 562 A.2d 7 (1989), we concluded that the test is whether the legislature intended, on the one hand, to provide a substantive right independent of collective bargaining or, on the other hand, to provide an enhanced remedy ancillary to and enforceable conjointly with rights established as a matter of collective bargaining. We applied this test in *Shortt* to hold that a statutory claim for unpaid wages under General Statutes § 31-72 furnished only an additional remedy and thus required exhaustion of applicable grievance and arbitration procedures. Id., 305–10. The plaintiff in this case has not argued that § 2-3a establishes the kind of independent substantive right that *Shortt* envisaged as appropriate for judicial rather than administrative reso-

lution in the first instance. The right to contest the merits of a suspension, like the right to collect wages, is integral to the employer-employee relationship. Id., 310; see also *School Administrators Assn.* v. *Dow,* supra, 382-83. We therefore agree with the trial court's implicit holding that the parties in this case were empowered, in their collective bargaining, to negotiate a contract that included the plaintiff's statutory claim under § 2-3a within contractually defined grievance and arbitration procedures.

We turn therefore to an examination of the terms of the collective bargaining agreement between the plaintiff's union and the defendant to determine whether its provisions manifest the parties' intention to include statutory claims about the validity of an unpaid leave within the agreement's designated grievance and arbitration procedures. The trial court correctly concluded that the agreement manifested such an intent.

We note, first, the breadth of the provisions in article II of the collective bargaining agreement, entitled "Grievance Procedure." Section 2.1 includes therein "[a]ny grievance or dispute which may arise between the parties concerning the application, meaning or interpretation of this Agreement . . . ." Section 2.4 provides in part: "Grievances involving discharge, suspension or demotion shall be processed at Step 3 of the grievance procedure and may be submitted thereafter to arbitration in accordance with the provision of Step 4 of the grievance procedure. No employee may be reprimanded, suspended, demoted or discharged except for just cause." It is difficult to imagine contractual wording that would more explicitly include disputes about the validity of a mandated unpaid leave of absence within the grievance procedure. We have only recently construed an arbitration clause referring to " 'any dispute between the parties hereto as to the

interpretation or application of the Agreement,' " as "broad and all encompassing" and persuasive evidence of "the parties' intent to have their disputes resolved, not by the courts but by an arbitration panel." *Emcon Corporation* v. *Pegnataro,* 212 Conn. 587, 592, 562 A.2d 521 (1989).

The collective bargaining agreement furthermore includes § 3.1 within its substantive provisions for "Personnel, Pay and Benefits." Section 3.1 expressly obligates both parties to "recognize and adhere to all provisions of Federal, State and City laws and ordinances which are in effect on the date this Agreement is ratified by the Association and which are not otherwise specifically superseded by the terms of this Agreement." The defendant presumably relied upon this section in invoking chapter XVI, § 12 of the Hartford charter, which forbids classified city employees from continuing in municipal service while running for public office.[5] Section 3.1 would, however, have been equally available to the plaintiff to challenge the validity of his enforced leave of absence in light of the antidiscrimination provisions of § 2-3a of the General Statutes. The placement of § 3.1 in article III, alongside sections defining entitlements to longevity payments, insurance, and pension benefits, demonstrates that § 3.1 was intended to be an operative part of the substantive terms of the collective bargaining agreement. Thus, any dispute about the applicability of a charter provision or a statute becomes a "dispute . . . between the parties concerning the application, meaning or interpretation of this Agreement" within the terms of § 2.1 defining grievable claims. This construction of the collective bargaining agreement accords with our policy of encouraging the use of collective bargaining and contractually designated grievance procedures as an alternative method of settling disputes that

---

[5] See footnote 3, supra, for the text of the charter provision.

avoids the formalities, delay, expense and vexation often associated with ordinary litigation. *New Haven* v. *AFSCME, Council 15, Local 530,* 208 Conn. 411, 415, 544 A.2d 186 (1988); *Administrative & Residual Employees Union* v. *State,* 200 Conn. 345, 349, 510 A.2d 989 (1986); *International Brotherhood of Teamsters* v. *Shapiro,* 138 Conn. 57, 62–63, 82 A.2d 345 (1951).

The judgment is affirmed.

In this opinion the other justices concurred.