ALBERTO SANTANA *v.* CITY OF HARTFORD

ALBERTO SANTANA *v.* BRUCE P. MARQUIS ET AL.
(AC 25994)

Lavery, C. J., and Schaller and Gruendel, Js.*

_____
* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued November 17, 2005—officially released March 21, 2006

*Kimball Haines Hunt*, for the appellant (plaintiff).

*Helen Apostolidis*, assistant corporation counsel, for the appellees (defendants).

*Opinion*

SCHALLER, J. The plaintiff, Alberto Santana, appeals from the judgment rendered in two consolidated actions. In the first action, the plaintiff unsuccessfully sought indemnification pursuant to General Statutes § 53-39a. In the second action, the trial court concluded that the plaintiff was not entitled to reinstatement as

a Hartford police officer following the judgment of acquittal on underlying criminal charges.[1] On appeal, the plaintiff claims that the court improperly (1) found that the crimes of which he was acquitted were not allegedly committed in the course of his duty as a police officer, (2) determined that the defendant city of Hartford (city) had the power to continue his suspension after his acquittal and (3) determined that his suspension without pay did not violate the state and federal constitutional guarantees of due process. We affirm the judgment of the trial court.

The court reasonably found, on the basis of a stipulation jointly filed by the parties, the following facts. The plaintiff became a Hartford police officer on August 16, 1985. On February 18, 1993, he was suspended without pay as a result of his arrest on felony charges. In December, 1994, as a result of the findings of an investigative grand jury, a second arrest warrant was issued and the charges were consolidated in an amended long form information.

The amended long form information, dated February 6, 2001, charged the plaintiff with the sale of a narcotic substance by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), possession of a narcotic substance with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b), conspiracy to distribute narcotics by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 (a) and 21a-278 (b), conspiracy to sell a controlled substance in violation of General Statutes §§ 53a-48 (a) and 21a-277 (b), and racketeering activity in violation of General Statutes § 53-395 (c). On March 20, 2001, the jury found the plaintiff not guilty as to

[1] In his first action, the plaintiff named the city of Hartford as the sole defendant. In the second action, the plaintiff named police chief Bruce P. Marquis and the Hartford police department as defendants.

three of the counts, and on July 12, 2001, a judgment of acquittal was rendered on the remaining counts.[2]

On July 17, 2001, the plaintiff, a member of the Hartford police union (union), requested that he be reinstated as a police officer. On July 31, 2001, the union filed on behalf of the plaintiff a grievance against the city regarding the failure to reinstate him. Various proceedings ensued, and the plaintiff's employment ultimately was terminated on June 6, 2002.

During the course of the administrative proceedings, the plaintiff initiated his first action, alleging that pursuant to § 53-39a, he was entitled to reimbursement for his expenses incurred as a result of the criminal charges filed against him. Following the termination of his employment, he commenced the second action in which he claimed that he was entitled to back pay and reinstatement as a police officer. The court consolidated the two actions, and the parties submitted a stipulation of facts and three binders of documentary evidence.

The court found that the charged criminal activity was not allegedly committed in the course of the plaintiff's duties as a police officer. As a result, the court concluded that he was not entitled to statutory indemnification. The court further determined that the termination of the plaintiff's employment did not violate the terms of the collective bargaining agreement between the city and the union and that the plaintiff's due process rights were not violated. Accordingly, the court ren-

---

[2] The court noted in its memorandum of decision that "[f]or some unexplained reason, the criminal case languished for years." The court also observed that the plaintiff did not request an administrative hearing or make an effort to compel a speedy trial. See General Statutes § 54-82m; Practice Book § 43-39. The court also stated: "There may or may not have been strategic reasons underlying the delay. Apparently, [the plaintiff], at the least, saw no urgency and may have seen some advantage in delay." Our review of the record similarly failed to uncover the reason for the delay.

dered judgment in favor of the defendants. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court improperly found that the crimes of which he was acquitted were not allegedly committed in the course of his duties as a police officer. Specifically, the plaintiff argues that he was entitled to economic indemnification under § 53-39a because the charged crimes allegedly were committed in the course of his employment as a police officer.[3] We disagree.

At the outset, a brief review of § 53-39a will facilitate our discussion. We begin with the text of the statute. Section 53-39a provides in relevant part: "Whenever, in any prosecution of an officer of . . . a local police department for a crime allegedly committed by such officer in the course of his duty as such, the charge is dismissed or the officer found not guilty, such officer shall be indemnified by his employing governmental unit for economic loss sustained by him as a result of such prosecution, including the payment of any legal fees necessarily incurred. . . ." Our Supreme Court has instructed that this statute, because it abrogates and modifies governmental immunity, should be strictly construed. *Rawling* v. *New Haven*, 206 Conn. 100, 105, 537 A.2d 439 (1988); see also *Cislo* v. *Shelton*, 240 Conn. 590, 598, 692 A.2d 1255 (1997).

"Section 53-39a . . . was originally enacted in 1973; see Public Acts 1973, No. 73-627 . . . . The general purpose of the statute is to permit police officers to recoup the necessary expenses that they have incurred

---

[3] The parties agreed that if the plaintiff was entitled to indemnification, he would receive $113,389.68 for attorney's fees, $277,413.53 in back wages and $3331 in earned leave time plus any applicable interest. The plaintiff further would be entitled to 100 holidays, 135 vacation days, 135 sick days and five earned leave days.

in defending themselves against unwarranted criminal charges arising out of their conduct in the course of their employment." (Citation omitted.) *Cislo* v. *Shelton*, supra, 240 Conn. 598. In order to obtain the benefit of the statute, a police officer must sustain a twofold burden of proof; that is, he must show that the charges against him were dismissed, or that he was acquitted, and that the charges arose in the course of his duty as a police officer. *Rawling* v. *New Haven*, supra, 206 Conn. 106.

In the present case, it is undisputed that the plaintiff was acquitted of the charges filed against him, thus satisfying the first prong.[4] We turn our attention, therefore, to the second prong. Our Supreme Court's decision in *Link* v. *Shelton*, 186 Conn. 623, 443 A.2d 902 (1982),[5]

---

[4] The fact that the plaintiff was acquitted of the charges against him is not conclusive proof that he did not engage in illegal behavior. As we explained in *Griffin* v. *Parker*, 22 Conn. App. 610, 619–20, 579 A.2d 532 (1990), rev'd on other grounds, 219 Conn. 363, 593 A.2d 124 (1991), the failure to establish activity beyond a reasonable doubt in a criminal case does not mean that such activity cannot be established by a fair preponderance of the evidence in a subsequent civil proceeding. See also *McKenna* v. *Whipple*, 97 Conn. 695, 701, 118 A. 40 (1922). The plaintiff, therefore, still bore the burden of proving, by a fair preponderance of the evidence, that the alleged criminal activity arose from his official police duties.

We further note that § 85 (3) of 2 Restatement (Second), Judgments (1982), provides: "A judgment against the prosecuting authority is preclusive against the government only under the condition stated in §§ 27–29." Id., p. 295. Comment (g) to § 85 provides in relevant part: "[T]he exception stated in § 28 (4) will almost always have the effect of withholding preclusion as to an issue of fact. *That subsection denies issue preclusive effect to a prior judgment when the party against whom the judgment was rendered had a significantly heavier burden of proof in the first action than in the second action. When the actions are successively criminal and civil, that is likely to be the case with respect to the government.*" (Emphasis added.) Id., p. 300. We disagree, therefore, with the plaintiff's strenuous assertions, repeated throughout his brief and at oral argument before this court, that his acquittal serves as conclusive proof that he did not engage in nefarious activity.

[5] In *Link*, the police officer arrived late for work and was instructed to meet with a police lieutenant and captain. *Link* v. *Shelton*, supra, 186 Conn. 625. "The discussion became an altercation, as a result of which the [police officer] was relieved from duty with pay and charged with breach of the

is the appropriate starting point for our analysis. "[I]n the course of his duty is not defined by the statute or explained by legislative history. As a term of art, or technical phrase, it has a peculiar and appropriate meaning in the law and shall be construed and understood accordingly. . . . Because the statute does not define the phrase, we must look elsewhere for the peculiar and appropriate meaning of in the course of his duty. We may look to the meaning given the same phrase in unrelated statutes, in this case the workers' compensation statutes; General Statutes § 31-275 et seq.; and consider that where the legislature uses the same phrase it intends the same meaning." (Citations omitted; internal quotation marks omitted.) *Link* v. *Shelton*, supra, 627; see also *Crotty* v. *Naugatuck*, 25 Conn. App. 599, 603, 595 A.2d 928 (1991). We therefore utilize "a three part test for deciding whether this statutory requirement has been met. Conduct will be found to have occurred in the course of duties if it took place (1) within the period of employment, (2) at a place where the employee could reasonably be, and *(3) while the employee is reasonably fulfilling the duties of employment or doing something incidental to it.*" (Emphasis added.) *Crotty* v. *Naugatuck*, supra, 603–604; see *Rawling* v. *New Haven*, supra, 206 Conn. 106–107; see also *Kish* v. *Nursing & Home Care, Inc.*, 248 Conn. 379, 383, 727 A.2d 1253 (1999).

We now identify the applicable standard of review. The question of whether the charges of alleged criminal conduct occurred in the course of the plaintiff's duty as a police officer is to be determined by the trier of fact. *Rawling* v. *New Haven*, supra, 206 Conn. 106;

peace." Id. In affirming the summary judgment rendered in favor of the police officer, our Supreme Court stated that "[a]ssaults . . . are considered as arising out of and in the course of employment either if the risk of assault is increased because of the nature or setting of the work, or if the reason for the assault was a quarrel having its origin in the work." (Internal quotation marks omitted.) Id., 628–29.

*Crotty* v. *Naugatuck*, supra, 25 Conn. App. 604. "Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Arena* v. *Arena*, 92 Conn. App. 463, 466, 885 A.2d 765 (2005); *Palmieri* v. *Cirino*, 90 Conn. App. 841, 846, 880 A.2d 172, cert. denied, 276 Conn. 927, 889 A.2d 817 (2005). In applying this deferential standard of review, we are mindful of the instruction that "[a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion [but instead determine whether the trial court's conclusion was] legally correct and factually supported." *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 367, 736 A.2d 824 (1999). Guided by these principles, we now turn to the specifics of the plaintiff's appeal.

The following additional facts are necessary for the resolution of this issue. An initial arrest warrant contained the following allegations against the plaintiff. Julio Davila Vasquez was arrested following surveillance by narcotics detectives. Vasquez gave an unsolicited statement that he had just packaged a substantial amount of heroin for sale. The detectives went to the apartment that Vasquez had left and knocked on the door. The door was opened by the plaintiff.[6] The plaintiff appeared nervous and denied knowing Vasquez. The

---

[6] Two other individuals, Patrick Medina and Monica Carvajal, were present in the apartment with the plaintiff.

plaintiff thereafter was observed leaving the apartment in his vehicle and driving away at a high rate of speed.

Vasquez provided the detectives with keys to his apartment and gave them permission to enter so that they could retrieve his identification. They observed, in plain view, several police uniforms. They suspected that the plaintiff had lied to them about knowing Vasquez. After obtaining a search warrant, they discovered a police radio battery and charger in the apartment, as well as several personal items belonging to the plaintiff. Additionally, Monica Carvajal stated that she had observed the plaintiff speaking with Vasquez about heroin. Carvajal had been in the apartment with the plaintiff when the detectives came to the door. As a result of his misleading the detectives regarding his knowledge of Vasquez, the plaintiff was charged with aiding and abetting Vasquez in the commission of a felony.

Following the plaintiff's arrest, an investigation was conducted that led to the second arrest warrant. This warrant contained additional allegations against the plaintiff, namely, that he had engaged in criminal activity concerning the manufacturing, distribution and sale of illegal drugs. These predicate activities, which occurred between June, 1992, and January 27, 1993, resulted in a charge of racketeering.

The dispositive inquiry is whether the conduct alleged arose out of the plaintiff's employment as a police officer.[7] By focusing on the third prong of the test reiterated in *Crotty*, we conclude that the court's finding that the charges arose outside of the scope of the plaintiff's employment was not clearly erroneous. The criminal

---

[7] The court stated that the plaintiff's first arrest was for "claimed conduct that appeared to have little to do with employment" and that his second arrest appeared to involve some abuse of his position as a police officer. The court then "[assumed] that at least some the claimed misconduct occurred while [the plaintiff] was on duty as a police officer of the city . . . ."

charges filed by the state against the plaintiff alleged that he was an active participant in an illegal drug trafficking enterprise. Whether he used his status as a police officer to facilitate this activity is of no consequence. Participating in the flow of illegal drugs cannot be said to be fulfilling the duties of a police officer or something incidental to it. Rather, such activity is incompatible with the duties of an individual employed in a law enforcement capacity, whose duty is to *prevent illegal activity, not participate in it.* Participating in unsanctioned illegal drug activity constitutes a departure from the "ultimate work" to be done by a police officer and removes such activity from the course of his official duties. Cf. *Kish* v. *Nursing & Home Care, Inc.*, supra, 248 Conn. 385. The plaintiff's employer, the city, certainly would not benefit from the conduct alleged in the charges against the plaintiff. See *Brown* v. *Dept. of Correction*, 89 Conn. App. 47, 56, 871 A.2d 1094, cert. denied, 274 Conn. 914, 879 A.2d 892 (2005). In fact, these charges stemmed from conduct that was a substantial deviation from the plaintiff's employment duties. Cf. *Kolomiets* v. *Syncor International Corp.*, 252 Conn. 261, 268–69, 746 A.2d 743 (2000). Put another way, there is simply no nexus between the conduct alleged in the charges and the plaintiff's duties as a police officer.[8] The court's findings on this issue were

---

[8] An example of when alleged crimes are connected to a police officer's official duties can be found in *Smith* v. *Hartford*, Superior Court, judicial district of Hartford, Docket No. 815432 (March 27, 2003). In that case, police Officer Eric Smith was dispatched to a residence to check on the welfare of a young child. Smith questioned the occupants of the residence on two occasions and determined that the child was not in danger. One of the occupants subsequently filed a complaint against Smith, alleging that he "engaged in sexually provocative conversation, fondled her breast and grabbed her buttocks." Following an investigation, Smith was charged with two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a. Following a jury trial, Smith was acquitted of all the charges, and he sought indemnification for the cost of his defense and lost wages. The court rendered judgment in favor of Smith and awarded him damages. See also *Hartford* v. *Hartford Police Union*, Superior Court, judicial district of Hartford, Docket Nos. 818283, 818912 (January 29, 2003)

not clearly erroneous. As such, the plaintiff failed to satisfy his burden of proving that he was entitled to indemnification pursuant to § 53-39a, and the court properly rendered judgment in favor of the city.

## II

The plaintiff next claims that the court improperly concluded that the city and the police department had the power to continue his suspension after his acquittal. Specifically, the plaintiff argues that the city opted to suspend him solely on the basis of the charged criminal conduct and that once he was acquitted, the city was unable to continue the suspension on the basis of the administrative proceedings. We disagree.

## A

Before reaching the substantive merits, we must determine whether the failure to exhaust the grievance procedures set forth in the collective bargaining agreement between the city and the union deprived the court of subject matter jurisdiction.[9] "A determination

(charges of assault, reckless endangerment, hindering prosecution, fabricating physical evidence, falsely reporting an incident and conspiracy to fabricate physical evidence arose from on duty pursuit and apprehension of criminal suspect); cf. *Rawling* v. *New Haven*, supra, 206 Conn. 106 (whether sexual assault charges arose from police officer's duties was question of fact and trial court improperly rendered summary judgment in favor of officer).

In *Smith*, the charges of criminal conduct stemmed from the plaintiff officer's investigative efforts to determine the status of the child. Clearly, it was within the scope of his employment to investigate the welfare of a young child. There was a direct connection or nexus between his official duties and the alleged criminal conduct of which he ultimately was acquitted. In the present case, there is no such connection. The plaintiff was charged with participating in an illegal activity that had no connection to his official duties. The mere fact that he was alleged to have used his status as a police officer to facilitate such activity does not make it within the course of his duty. Absent some connection to his duties as a police officer, the plaintiff is not entitled to indemnification pursuant to General Statutes § 53-39a.

[9] The court stated in its memorandum of decision: "I note that I have expressed reservations [about] whether this portion of the dispute is properly before the court. I asked the parties to respond to the issue of whether administrative remedies have been exhausted. The response of the parties, at the risk of overgeneralization, was that the substantive *merits* of the

regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it. . . . A court does not truly lack subject matter jurisdiction if it has competence to entertain the action before it. . . . It often is stated that a challenge to subject matter jurisdiction can be raised at any time and that [o]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Citation omitted; internal quotation marks omitted.) *Urban Redevelopment Commission* v. *Katsetos*, 86 Conn. App. 236, 240–41, 860 A.2d 1233 (2004), cert. denied, 272 Conn. 919, 866 A.2d 1289 (2005); see also *In re Shonna K.*, 77 Conn. App. 246, 250–51, 822 A.2d 1009 (2003). Simply put, our Supreme Court "has often stated that the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, at any time. . . . [T]he court has a duty to dismiss, even on its own initiative, any appeal that it lacks jurisdiction to hear." (Internal quotation marks omitted.) *Kozlowski* v. *Commissioner of Transportation*, 274 Conn. 497, 502, 876 A.2d 1148 (2005).

The following factual background is relevant for our discussion. The plaintiff at all relevant times, was a

charges were appropriately addressed by arbitration, but not whether the issues were *arbitrable*, and that constitutional issues and those collateral to the merits of the charges were appropriate for the court to resolve." (Emphasis in original.)

member of the union. The city and the union had entered into a collective bargaining agreement. Article II of the collective bargaining agreement set forth a four step procedure for the resolution of grievances.[10] Section 2.2 required that grievances involving suspension or discharge of an employee begin at the "third step."

Following the plaintiff's first arrest, he received a letter, dated February 18, 1993, from the then chief of police, Ronald J. Loranger. The letter provides in part: "Due to the nature of the circumstances leading to your arrest, I have had no option but to order your suspension from duty without pay pending the outcome of this matter either through criminal court or the Police Department administrative process. You were suspended by Captain [Joseph F.] Croughwell effective February 16, 1993."[11] The letter also charged the plaintiff

---

[10] Section 2.1 of the collective bargaining agreement provides that step one of the grievance process involves the employee and his or her first level supervisor, who is outside of the bargaining unit. The grievance must be taken to this supervisor within seven working days of either its occurrence or the employee's knowledge of the occurrence. The supervisor's decision is required within seven working days.

If the grievance is not resolved at the step one level, it proceeds to step two, where a written statement is provided to the chief of police within seven working days of the supervisor's decision. This written statement must be signed and must contain a statement of the grievance and the facts involved, the specific provision of the agreement that had been violated and the remedy requested. The chief, or his designated representative, is then required to render a written decision within fourteen working days.

If the grievance remains unsettled, it advances to step three, which requires written notice to the city director of personnel within five working days of the step two decision. The director may meet with the interested parties within ten working days and must issue a written decision within fifteen working days of the receipt of the grievance.

Step four is the final step of the grievance process. The union has thirty working days from the receipt of the city director's decision to notify the city director of the intention to proceed to arbitration and must also notify the state board of mediation and arbitration.

[11] Section six of appendix A of the collective bargaining agreement provides that "[n]o officer shall be suspended without pay until a disciplinary hearing has been conducted . . . unless he or she has been arrested for a

with violating the Hartford police department code of conduct, article I, § 1.00, which provides that "[a]ny violation of the rules and regulations, published order, directives, memoranda, or any lawful order, or any act which tends to undermine the good order, efficiency and discipline of the department, or which reflects discredit upon the department of any member thereof, shall constitute conduct unbecoming an employee."

After the favorable disposition of the criminal charges against him, the plaintiff, through his attorney, sent a letter dated July 17, 2001, to the police chief, the defendant Bruce P. Marquis, requesting reinstatement as a police officer. On July 31, 2001, the plaintiff initiated a "third step" grievance proceeding because he had not received a reply to his request. The issue set forth for resolution was "[w]hether any article of the collective bargaining agreement requires the department to reinstate a suspended employee prior to the conclusion of its administrative process. If not, the grievance shall be denied." On September 10, 2001, a decision was issued, and it was determined that the plaintiff's grievance had been filed prematurely and that the administrative proceedings needed to be completed.[12]

On October 12, 2001, the police department commenced an administrative investigation of the plaintiff relating to the allegations of conduct unbecoming a police officer. Approximately one month later, Marquis informed the plaintiff that a disciplinary hearing would be conducted as was "customary." By a letter dated April 3, 2002, the plaintiff was informed that a disciplinary hearing had been scheduled for May 3, 2002. Neither the plaintiff nor his attorney attended the hearing, but

felony, a sexual offense and/or a crime of larceny under the Connecticut Penal Code."

[12] The city's personnel director, Patricia C. Washington, designated Jane K. Heffernan, principal personnel analyst, as her representative at the grievance hearing.

his union's counsel, attorney Frank J. Szilagyi, did argue on the plaintiff's behalf.[13] The hearing officer ultimately sustained the charge of conduct unbecoming an officer[14] and recommended disciplinary sanctions.

In a letter dated May 23, 2002, Marquis informed the plaintiff that he was upholding the results of the disci-

[13] Szilagyi stated that he represented the Hartford police union and unsuccessfully moved for a continuance. The hearing officer did allow the plaintiff, through his attorney, to submit a written statement of his position.

[14] The hearing officer made the following findings. "The union's position on behalf of [the plaintiff] that the letter signed by Ronald Loranger prevents an administrative review of this matter is without merit. *A police department would be remiss to not assess the conduct of a sworn police officer by administrative standards, especially when such a serious violation of the public trust is alleged.* As for the application of Order 3-2, dated 11/2/81, this policy entitled 'Citizen Complaint Procedure' is a guideline for the investigation of citizen complaints. The administrative review of [the plaintiff's] conduct was not the result of a citizen complaint, *but an exercise of management prerogative to direct employees, take disciplinary action, maintain efficiency of government operations and fulfill legal responsibilities.*

"That being noted, the [police] department's investigation had revealed substantial evidence that on January 27, 1993, [the plaintiff] knowingly and wilfully associated with individuals in the distribution of narcotics. That [the plaintiff] failed to take police action against such individuals as is required under the Connecticut General Statutes and his sworn oath. That rather than taking police action when a felony was taking place, [the plaintiff] took affirmative steps to hinder the narcotics investigation by lying to investigating officers of his own police department. That the location where these offenses took place, and where [the plaintiff] was present, was directly linked by physical evidence to the distribution of narcotics. That the person arrested on January 27, 1993, with two hundred (200) bags of heroin that just had left [the plaintiff] and lives with [the plaintiff's] mother. That [the plaintiff] maintained an ongoing association with his mother and her home that she shared with the arrested narcotics dealer to the extent that [the plaintiff] kept his uniforms and police department issued equipment at her home. That an affidavit referenced in the administrative investigation includes the content of a sworn affidavit implicating [the plaintiff] as having direct knowledge and involvement in the distribution of narcotics. That the administrative investigation revealed additional instances that demonstrate a pattern of narcotics involvement on the part of [the plaintiff]. That the culpability of [the plaintiff] in the narcotics trade rose to a level of probable cause (sufficient facts to lead a reasonably prudent person to believe a crime was committed and the individual to be arrested had committed the

plinary hearing and continuing the suspension for an additional two weeks. Marquis also terminated the plaintiff's employment, effective June 6, 2002. A "fourth step" grievance proceeding involving the state board of mediation and arbitration was commenced, but the parties, by way of an agreement dated July 15, 2003, elected to have the Superior Court resolve the disputed issues.[15] In short, the parties failed to exhaust the grievance procedure as detailed in the collective bargaining agreement.

We recently stated that "[i]t is well settled under both federal and state law that, before resort to the courts is allowed, an employee must at least attempt to exhaust exclusive grievance and arbitration procedures, such as those contained in the collective bargaining agreement between the defendant and the plaintiffs' union. . . . Failure to exhaust the grievance procedures deprives the court of subject matter jurisdiction. . . . The purpose of the exhaustion requirement is to encourage the use of grievance procedures, rather than the courts, for settling disputes. A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. . . . [I]t would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation would inevitably exert a disruptive influence upon both the negotiation and

crime) as determined by a Superior Court Judge serving as a grand juror." (Emphasis added.)

[15] We are mindful that our Supreme Court has "consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld unless an award clearly falls within the proscriptions of [General Statutes] § 52-418 of the General Statutes." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 473, 747 A.2d 480 (2000).

administration of collective agreements." (Citations omitted; internal quotation marks omitted.) *Sobczak* v. *Board of Education*, 88 Conn. App. 99, 103, 868 A.2d 112, cert. denied, 273 Conn. 941, 875 A.2d 43 (2005); see also *Neiman* v. *Yale University*, 270 Conn. 244, 253–54, 851 A.2d 1165 (2004); *Saccardi* v. *Board of Education*, 45 Conn. App. 712, 715–16, 697 A.2d 716 (1997).

Nevertheless, our Supreme Court has "grudgingly carved several exceptions from the exhaustion doctrine . . . although only infrequently and only for narrowly defined purposes. . . . One of the limited exceptions to the exhaustion rule arises when recourse to the administrative remedy would be demonstrably futile." (Citations omitted; internal quotation marks omitted.) *Sobczak* v. *Board of Education*, supra, 88 Conn. App. 103–104. An action is futile when "such action could not result in a favorable decision and invariably would result in further judicial proceedings. . . . The guiding principle in determining futility is that the law does not require the doing of a useless thing." (Citation omitted; internal quotation marks omitted.) *Frank* v. *Dept. of Parks & Recreation*, 78 Conn. App. 601, 606–607, 828 A.2d 692, cert. granted on other grounds, 266 Conn. 914, 833 A.2d 465 (2003) (appeal withdrawn March 19, 2004); see also *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 1, 19, 756 A.2d 262 (2000), over-ruled in part on other grounds by *Waterbury* v. *Washington*, 260 Conn. 506, 545, 800 A.2d 1102 (2002); *Sobczak* v. *Board of Education*, supra, 104.

In the present case, it would have been futile for the parties to proceed with arbitration. Section 2.1 of the collective bargaining agreement provides that, at the "step four" stage, the state board of mediation and arbitration "shall be limited to the express terms of the contract and shall not have the power to modify, amend or delete any terms or provisions of the Agreement, or

render a decision contrary to law." The state board would not have been able to provide the plaintiff the relief sought, namely, interpreting the collective bargaining agreement in the absence of any definitive language. The collective bargaining agreement is silent as to whether an administrative proceeding may be completed after the acquittal of criminal charges. There are no express terms in the collective bargaining agreement regarding this issue, and therefore the state board lacked the ability to provide the plaintiff with the relief requested. In other words, the plaintiff could not obtain a favorable decision, and further judicial proceedings were necessary. We conclude, therefore, that it would have been futile for the parties to exhaust the grievance proceedings as set forth in the collective bargaining agreement and that this issue was within the subject matter jurisdiction of the court.

B

The issue before the court was whether the terms of the collective bargaining agreement allowed the city to continue the plaintiff's suspension following his acquittal. Specifically, the plaintiff claims, on the basis of Loranger's February 18, 1993 letter indicating that he had "no option but to order [the plaintiff's] suspension from duty without pay pending the outcome of this *matter either through criminal court or the Police Department administrative process*"; (emphasis added); that once the city chose to proceed with criminal charges, it forfeited the ability to pursue the matter through the administrative process. In order to resolve this issue, the court was required to interpret the intent of the parties to the collective bargaining agreement. We in turn review the court's interpretation.

"Where . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . [W]e

interpret contract language in accordance with a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . If the terms of [a contract] are clear, their meaning cannot be forced or strained by an unwarranted construction to give them a meaning which the parties obviously never intended. . . . A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Citation omitted; internal quotation marks omitted.) *Southington* v. *Commercial Union Ins. Co.*, 71 Conn. App. 715, 725–26, 805 A.2d 76 (2002).

The court, however, concluded that the collective bargaining agreement between the parties was ambiguous because it did not expressly state or discuss whether an administrative proceeding could be initiated following an unsuccessful criminal prosecution. That determination of ambiguity is a question of law, subject to de novo review by this court. *Detels* v. *Detels*, 79 Conn. App. 467, 472, 830 A.2d 381 (2003); see also *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 670, 791 A.2d 546 (2002).

"Well established principles guide our analysis in determining whether the language of a contract is ambiguous. [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Internal quotation marks omitted.) *Nationwide Mutual Ins. Co.* v. *Allen*, 83 Conn. App. 526, 537–38,

850 A.2d 1047, cert. denied, 271 Conn. 907, 859 A.2d 562 (2004). It is unclear from the collective bargaining agreement whether the city could subject the plaintiff to both criminal and administrative proceedings or whether, once it elected to pursue one course of action, it was prevented from utilizing the second. As we have stated, "[a]mbiguous . . . means unclear or uncertain . . . [or] that which is susceptible of more than one interpretation or understood in more ways than one." (Internal quotation marks omitted.) *Kremenitzer* v. *Kremenitzer*, 81 Conn. App. 135, 141, 838 A.2d 1026 (2004). In short, we agree that the collective bargaining agreement was ambiguous with respect to this issue. The court then properly proceeded to search the record for evidence of the intent of the contracting parties. See *Charette* v. *Waterbury*, 80 Conn. App. 232, 237, 834 A.2d 759 (2003), cert. denied, 267 Conn. 910, 840 A.2d 1172 (2004).

Because the relevant contract language is ambiguous, "[t]he determination of the intent of the parties to a contract . . . is a question of fact subject to review under the clearly erroneous standard." (Internal quotation marks omitted.) *Rund* v. *Melillo*, 63 Conn. App. 216, 221, 772 A.2d 774 (2001); see also *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 18, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005); *Larson* v. *Jacobson*, 38 Conn. App. 186, 189, 659 A.2d 753 (1995). Our Supreme Court has instructed that appellate courts "construe a contract in accordance with what [the courts] conclude to be the understanding and intention of the parties as determined from the language used by them interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . The intention of the parties manifested by their words and acts is essential to determine the meaning and terms of the contract and that intention may be gathered from all such permis-

sible, pertinent facts and circumstances." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 97, 831 A.2d 211 (2003).

The court found that "it was [not] the intention of the city or, for that matter, of the parties to the [collective bargaining agreement] to delegate to the courts the resolution of whether [the plaintiff] engaged in activity unbecoming to an officer . . . ." In support of this finding, the court noted that the issue in a criminal trial, i.e., establishing guilt beyond a reasonable doubt of all of the elements of a crime, was "quite different" from those in the present administrative setting, namely, whether an individual had engaged in behavior that was unbecoming of a police officer. The court stated: "The procedures and protections in the forums are widely variant." Furthermore, the collective bargaining agreement did not provide any express details with respect to when the suspension was to end and did not provide for an automatic reinstatement after an acquittal in the criminal proceedings. Last, delaying civil proceedings until the conclusion of the criminal trial protected the plaintiff from an adverse inference had he invoked his fifth amendment privilege against self-incrimination.[16] In short, the court found that, despite the language[17] used in Loranger's February, 1993 letter, "[n]either party intended to delegate to the criminal justice system the resolution of the disciplinary action."

---

[16] "The fifth amendment to the constitution of the United States provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[17] The court also offered the following explanation for the language contained in the February 18, 1993 letter. "I can identify a scenario in which the language makes perfect sense, though it has not been articulated. If [the plaintiff] had been convicted, it may well be that the entire controversy would have been ended because a jury would have found beyond a reasonable doubt that he had engaged in at least some of the conduct which formed the basis for the administrative charge. So, the outcome could be resolved by the criminal court, *or*, if there is not a conviction, the resolution would occur in the administrative arena." (Emphasis in original.)

We also note that § 4 of appendix A of the collective bargaining agreement indicates that if any police officer is under investigation for any reason, such an investigation may lead to "*disciplinary and/or criminal charges* . . . ." (Emphasis added.) The section indicates that both criminal and administrative proceedings are within the ambit of the collective bargaining agreement.

"This court has stated frequently that [a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . While conducting our review, we properly afford the court's findings a great deal of deference because it is in the unique [position] to view the evidence presented in a totality of circumstances . . . ." (Internal quotation marks omitted.) *Bijur* v. *Bijur*, 79 Conn. App. 752, 761–62, 831 A.2d 824 (2003). Despite the language used in the letter initially suspending the plaintiff, we cannot say the court's factual finding regarding the intent of the contracting parties was clearly erroneous. The use of "or" could have been used, as the court suggested, for the situation in which an employee is suspended on the basis of the pending criminal charges and the suspension on the administrative basis is used if, and only if, those criminal charges are resolved in favor of the employee. There is evidence in the record to support the court's finding, and we are not left with a definite and firm conviction that a mistake was made. We conclude, therefore, that the court's finding was not clearly erroneous.

III

The plaintiff next claims that the court improperly concluded that his suspension without pay did not violate the state and federal constitutional guarantees of

due process.[18] The plaintiff specifically claims that the court failed to consider the time that elapsed from his suspension until his acquittal when determining whether his due process rights were violated.[19] Put another way, the plaintiff contends that he was not afforded a hearing within a timely manner following his suspension and that this lack of a hearing resulted in a violation of due process.[20] We disagree.

We begin by identifying the relevant legal principles. "Our due process inquiry takes the form of a two part

[18] The plaintiff has failed to brief separately the state constitutional issues. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless [we have been provided with] an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the . . . claim." (Internal quotation marks omitted.) *Whitaker* v. *Commissioner of Correction*, 90 Conn. App. 460, 462 n.1, 878 A.2d 321, cert. denied, 276 Conn. 918, 888 A.2d 89 (2005). Accordingly, we limit our review of the plaintiff's claim to the relevant portions of the federal constitution.

The fourteenth amendment to the United States constitution provides in relevant part that "the State [shall not] deprive any person of life, liberty or property, without due process of law . . . ."

[19] General Statutes § 31-51bb provides: "No employee shall be denied the right to pursue, in a court of competent jurisdiction, a cause of action arising under the state or federal Constitution or under a state statute solely because the employee is covered by a collective bargaining agreement. Nothing in this section shall be construed to give an employee the right to pursue a cause of action in a court of competent jurisdiction for breach of any provision of a collective bargaining agreement or other claims dependent upon the provisions of a collective bargaining agreement."

Section 31-51bb is a statutory exception to the exhaustion doctrine and, therefore, the failure to complete the grievance proceedings did not deprive the court of subject matter jurisdiction with respect to the plaintiff's constitutional claim. *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 628 A.2d 946 (1993); see also *Bigio* v. *Montagna*, Superior Court, judicial district of New Haven, Docket No. 442522 (October 2, 2003) (holding that § 31-51bb saved constitutional claim, but not common-law claims, from dismissal under exhaustion doctrine). Accordingly, this issue is before us properly.

[20] "Due process is not a technical concept with a fixed content unrelated to time, place and circumstances. . . . Rather, it is a flexible doctrine, requiring such procedural protections as the particular situation demands. *Morrissey* v. *Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484

analysis. [W]e must determine whether [the plaintiff] was deprived of a protected interest, and, if so, what process was . . . due. . . . If a claimant does not sufficiently establish the existence of a constitutionally protected interest, the due process analysis ceases because no process is constitutionally due for the deprivation of an interest that is not of constitutional magnitude." (Citation omitted; internal quotation marks omitted.) *Tuchman* v. *State*, 89 Conn. App. 745, 755, 878 A.2d 384, cert. denied, 275 Conn. 920, 883 A.2d 1252 (2005). Section 2.2 of the collective bargaining agreement provides that "[*n*]*o* employee shall be suspended, discharged, demoted or disciplined *except for just cause*." (Emphasis added.) Our Supreme Court has stated that "[i]t is undisputed that the [employee] had a property interest in his continued employment . . . because the collective bargaining agreement stated that he could be terminated only for 'just cause.' " *Tedesco* v. *Stamford*, 222 Conn. 233, 242, 610 A.2d 574 (1992); see also *Hunt* v. *Prior*, 236 Conn. 421, 437, 673 A.2d 514 (1996); *Bartlett* v. *Krause*, 209 Conn. 352, 367, 551 A.2d 710 (1988). The court properly concluded that the plaintiff "had a property right in continuing employment which was constitutionally entitled to be protected against procedural due process violations because [his employment] could be terminated only for certain sorts of cause." The issue, therefore, is whether the plaintiff's suspension prior to a hearing was a deprivation of his protected property right without due process.

"The United States Supreme Court analyzes claims of procedural due process in accordance with the three part test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). The Connecticut Supreme Court uses the same test. *Sassone* v. *Lepore*, 226 Conn. 773, 781, 629 A.2d 357 (1993). That

(1972)." (Internal quotation marks omitted.) *Johnson* v. *Dept. of Public Health*, 48 Conn. App. 102, 118, 710 A.2d 176 (1998).

test requires a consideration of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Giordano* v. *Giordano*, 39 Conn. App. 183, 194, 664 A.2d 1136 (1995); see also *Harkless* v. *Rowe*, 232 Conn. 599, 625, 657 A.2d 562 (1995). In the present case, there are two distinct time periods that we must consider. The first period is the time from the plaintiff's suspension through his acquittal.[21] The second period runs from his request for reinstatement to his disciplinary hearing on May 3, 2002. We will address each in turn.

A

The plaintiff claims that his due process rights were violated when he was suspended without pay and without a hearing from February 18, 1993, through his July 12, 2001 acquittal. The plaintiff further argues that the court improperly excluded this time period from its calculation of the length of time involved in the postsuspension investigation and failed to apply the holding of the United States Supreme Court case *Gilbert* v. *Homar*, 520 U.S. 924, 117 S. Ct. 1807, 138 L. Ed. 2d 120 (1997). We are not persuaded.

We begin our analysis with a summary of *Gilbert*. In that case, the respondent, Richard J. Homar, was a police officer at a Pennsylvania university. Id., 926. On August 26, 1992, he was arrested by the state police in a drug raid and charged with certain felony offenses. Id., 926–27. He immediately was suspended without pay. Id., 927. The criminal charges against the respon-

---

[21] This period ran from February 18, 1993, through July 12, 2001.

dent were dropped on September 1, 1992, but the administrative proceedings continued. Id. After a series of meetings held during September, 1992, the respondent's demotion was sustained. Id. The issue before the United States Supreme Court was whether it was constitutionally permissible to suspend the respondent without pay without first affording him a hearing. Id., 928.

The court began its analysis by applying the *Mathews* factors. Id., 931. The court acknowledged the respondent's interest in "the uninterrupted receipt of his paycheck"; id., 932; but also noted the important state interest. "On the other side of the balance, the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers." Id. The most important factor, however, was the "risk of erroneous deprivation and the likely value of any additional procedures." Id., 933.

In reaching its decision in favor of the petitioners, the court concluded: "[T]he State had no constitutional obligation to provide respondent with a presuspension hearing. We noted in [*Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)] that the purpose of a pre-*termination* hearing is to determine whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. [Id., 545–46]. By parity of reasoning, the purpose of any pre-*suspension* hearing would be to assure that there are reasonable grounds to support the suspension without pay. Cf. [*Federal Deposit Ins. Corp.* v. *Mallen*, 486 U.S. 230, 240, 108 S. Ct. 1780, 100 L. Ed. 2d 265 (1988)]. *But here that has already been assured by the arrest and the filing of charges.*

"In *Mallen*, we concluded that an ex parte finding of probable cause such as a grand jury indictment provides

adequate assurance that the suspension is not unjustified. . . . The same is true when an employee is arrested and then formally charged with a felony. *First, as with an indictment, the arrest and formal charges imposed upon respondent by an independent body demonstrat[e] that the suspension is not arbitrary. . . . Second, like an indictment, the imposition of felony charges itself is an objective fact that will in most cases raise serious public concern. . . .* It is true, as respondent argues, that there is more reason to believe an employee has committed a felony when he is indicted rather than merely arrested and formally charged; but for present purposes arrest and charge give reason enough. They serve to assure that the state employer's decision to suspend the employee is not baseless or unwarranted . . . in that an independent third party has determined that there is probable cause to believe the employee committed a serious crime." (Citations omitted; emphasis added; internal quotation marks omitted.) *Gilbert* v. *Homar, supra*, 520 U.S. 933–34.

In the present case, the court properly excluded the time frame from the plaintiff's suspension until his acquittal. In accord with *Gilbert*, following the plaintiff's arrest and the presentment of charges by the grand jury, there was an independent finding of probable cause that provided sufficient protection against an improper suspension. This finding remained in effect until the criminal prosecution was completed. Any additional hearings would not serve any useful purpose in light of the probable cause determination underlying the plaintiff's arrest and charges filed against him.[22] In short,

---

[22] We also note that § 6 (a) of appendix A of the collective bargaining agreement provides: "No officer shall be suspended without pay until a disciplinary hearing has been conducted except as provided in Paragraphs (b) and (c) below *or unless he or she has been arrested for a felony,* a sexual offense and/or a crime of larceny under the Connecticut Penal Code." (Emphasis added.) Pursuant to this subsection, a postsuspension hearing was not required. "Unions and their employers have broad contractual authority to provide administrative remedies for disputes arising out of the

although there was an appreciable delay in the present case from the plaintiff's arrest on felony charges and suspension until his acquittal, we disagree that such a delay[23] constituted a violation of his due process rights.

## B

The plaintiff next claims that his due process rights were violated when he was suspended without pay from the time that he requested reinstatement on July 12, 2001, until his disciplinary hearing on May 3, 2002. The plaintiff specifically argues that the court improperly failed to conclude that the process that was followed after his acquittal was constitutionally infirm and not done within a reasonable time. We are not persuaded.

We briefly summarize the facts pertinent to the plaintiff's claim. Following his acquittal on July 12, 2001, the plaintiff requested reinstatement by letter dated July 17, 2001. He also filed a "third step" grievance on July 31, 2001, seeking reinstatement. The city's director of

employment relationship." *Trigila* v. *Hartford*, 217 Conn. 490, 494, 586 A.2d 605 (1991). In this case, the union and the city agreed that if a police officer is arrested for a felony, a sexual crime or a crime of larceny, then that officer is subject to suspension and no hearing is required. Subsection (b) and (c) of § 6 of appendix A allow for the immediate suspension without pay of a police officer in certain circumstances, but expressly require a subsequent hearing soon thereafter. It would appear, therefore, on the ground of the collective bargaining agreement, that the plaintiff was not entitled to a hearing until the criminal charges had been resolved. See *Gilbert* v. *Homar*, supra, 520 U.S. 930.

[23] As we have noted, the record is unclear as to the reason for the delay. It is axiomatic that "[i]t is not the function of this court to find facts. . . . Our role is . . . to review claims based on a complete factual record . . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the plaintiff's claims] would be entirely speculative." (Internal quotation marks omitted.) *Johnson* v. *Mazza*, 80 Conn. App. 155, 163, 834 A.2d 725 (2003); see also *Mazzone* v. *Connecticut Transit Co.*, 240 Conn. 788, 797–98, 694 A.2d 1230 (1997). There is nothing in the record before us to suggest, however, that the plaintiff ever filed a motion for a speedy trial pursuant to Practice Book § 43-39 et seq. or requested an expedited postsuspension hearing. See footnote 2.

personnel denied the grievance on September 10, 2001, concluding that it was filed prematurely. An administrative investigation was not commenced until October 12, 2001.[24] The plaintiff was interviewed on October 31, 2001. In a letter dated April 3, 2002, the city notified the plaintiff that a disciplinary hearing was scheduled for May 3, 2002. Following that hearing, Marquis sent the plaintiff a letter dated May 23, 2002, upholding the hearing officer's finding that the charge of conduct unbecoming a police officer was sustained and terminated the plaintiff's employment effective June 6, 2002.

Our Supreme Court's decision in *Tedesco* v. *Stamford*, supra, 222 Conn. 233, provides the framework for our analysis. The dispositive issue in that case was "whether a municipal employee whose employment was terminated was afforded his fourteenth amendment right to procedural due process by the union grievance procedures under a collective bargaining agreement." Id., 234. In *Tedesco*, the plaintiff, a trash collector, was discharged after missing nearly two years of work following an injury. Id., 235. The plaintiff's union filed a grievance on his behalf, and union representatives met with both the deputy commissioner and the commissioner of public works. Id., 236–37. The commissioner ultimately denied the grievance and the union refused to pursue the matter further. Id., 236. Our Supreme Court concluded that the grievance procedures set forth in the collective bargaining agreement satisfied the plaintiff's right to due process. Id., 241.

The court initially noted that due process is flexible and "calls for such . . . protections as the particular situation demands"; (internal quotation marks omitted) id., 242; and then applied the three *Mathews* factors.

---

[24] Marquis sent the plaintiff's counsel a letter, dated November 11, 2001, indicating that a disciplinary hearing would be scheduled "as is customary after the resolution of criminal charges against a police officer . . . ."

Id., 242–43. After acknowledging the private interest in retaining employment, the court stated: "The plaintiff's interest, however, is tempered in this case by the societal interest in an orderly and efficient system of dispute resolution in the public sector in the form of union grievance procedures set forth in a collective bargaining agreement, with benefits inuring to both employer and employee. . . . As the United States Court of Appeals for the Seventh Circuit noted in *Parrett* v. *Connersville*, 737 F.2d 690, 696 (7th Cir. 1984), [a]lthough the framers of the Fourteenth Amendment . . . could not have foreseen the rise of public-employee unions, grievance procedures, and other phenomena of modern labor relations . . . the concept of due process is sufficiently flexible to allow the courts to work out an accommodation between the interest in an orderly system of labor relations in the public sector as elsewhere and public employees' interest in procedural protections of job rights classified as property rights." (Citations omitted; internal quotation marks omitted.) *Tedesco* v. *Stamford*, supra, 222 Conn. 244–45.

In *Tedesco*, the court stated that "[t]he plaintiff's interest . . . is also tempered when one balances the minimal risk of an erroneous deprivation of the plaintiff's property interest through the procedures used in the collective bargaining agreement against the minimal value additional procedural safeguards would provide and the adverse effect such additional safeguards would have on the labor relations process." Id., 245. The court concluded that "under the balancing test set forth in *Mathews* . . . the plaintiff received all the process that he was due. We recognize that the employee's interest in his employment is great. That interest, however, is tempered by the government's interest in an orderly termination process, the minimal risk of an erroneous deprivation of the plaintiff's property interest under the grievance procedures in the collective bargaining

agreement, the minimal incremental value of additional or substitute procedural safeguards and the adverse effect additional procedures would have on the labor relations process." Id., 252.

In the present case, the plaintiff, in effect, was suspended without pay and without a hearing from July, 2001, through May, 2002, a period of approximately ten months. In concluding that the plaintiff's due process rights were not violated, the court considered the following factors. First, there had been a finding of probable cause against the plaintiff and, although he eventually was acquitted of those charges, that finding formed the basis for the administrative charge of conduct unbecoming a police officer, which was sustained by the hearing officer, albeit under a lesser burden of proof. Second, the court noted that the plaintiff did not press for an expedited hearing. Third, the plaintiff was a member of the union and subject to the collective bargaining agreement. If his grievance had succeeded, the need for a hearing would have been obviated. Fourth, the delay, in part, was caused by the grievance proceedings. Finally, the process of the administrative investigation and eventual hearing was designed to minimize mistakes in the process. The court stated: "The avoidance of a rush to judgment also carries a price."

Although the delay of ten months is troublesome, we agree that in the present case, such a delay did not violate the plaintiff's due process rights. Without question, the plaintiff possessed a substantial private interest in his employment as a police officer. The government, however, maintained a strong interest in ensuring the suitability of those entrusted to enforce the laws as police officers. See, e.g., *Gilbert* v. *Homar*, supra, 520 U.S. 932; *South Windsor* v. *South Windsor Police Union Local 1480*, 57 Conn. App. 490, 507–10, 750 A.2d 465 (2000), rev'd on other grounds, 255 Conn.

800, 770 A.2d 14 (2001). In our view, however, the crucial factors are the presence of a collective bargaining agreement, coupled with the fact that an investigation did commence within a reasonable time after the plaintiff's request for reinstatement. As we noted, the plaintiff was interviewed by investigators in November, 2001. We did not mean to suggest that such an interview, standing alone, was a proper replacement for a hearing, but it does indicate that the matter was proceeding and the plaintiff was able to advance his position to the investigators. Had the investigators found the plaintiff's claims credible, the matter could have ended at that point, resulting in additional proceedings being unnecessary. In *Homar* v. *Gilbert*, 63 F. Sup. 2d 559 (M.D. Pa. 1999), the United States District Court, following a remand order from the United States Supreme Court, considered both the presence of a collective bargaining agreement and the employee's failure to object to the lack of a hearing, as reasons for concluding that his due process rights were not violated. Id., 570. Moreover, in light of our Supreme Court's decision in *Tedesco* v. *Stamford*, supra, 222 Conn. 233, the protections afforded by the collective bargaining agreement, in addition to the minimal incremental value of additional proceedings, along with the adverse effects on the labor process, we conclude that the court properly determined that the plaintiff's right to due process was not violated.

The judgment is affirmed.

In this opinion the other judges concurred.