# IN RE JAIME S.*
## (AC 30956)

Lavine, Beach and Robinson, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 5—officially released April 27, 2010

*David J. Reich*, for the appellant (respondent).

*Howard I. Gemeiner*, for the appellee (petitioner).

*Opinion*

LAVINE, J. This appeal requires that we determine whether the trial court properly found that the respondent father had abandoned his son pursuant to General Statutes § 45a-717 (g) (2) (A). In adjudicating a petition to terminate parental rights on the ground of abandonment, the court's focus is on the parent's conduct. *In re Kezia M.*, 33 Conn. App. 12, 17, 632 A.2d 1122, cert.

denied, 228 Conn. 915, 636 A.2d 847 (1993). The father[1] claims on appeal that (1) the court's findings that (a) he abandoned his son and (b) it was in the son's best interest to terminate his parental rights are clearly erroneous, and (2) the court violated his right to due process by denying his request for a continuance so that he could participate in the second day of trial. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of the father's claims. On March 19, 2007, the petitioner mother filed a petition to terminate the parental rights of the father as to their son in the Court of Probate for the district of Meriden. In support of her petition, the mother alleged that she and the father married in Riverside in 1999, separated in 2001 and were divorced in the state of New York in 2003. In October, 2002, a New York court ordered an emergency medical evaluation of the father on the basis of his conduct in open court. The father indicated that he was going to commit suicide. The mother also alleged that, during and subsequent to the divorce proceedings, the court ordered supervised visitation for the father with his son but that the supervising agencies terminated the visitation due to the father's inappropriate behavior.

The mother further alleged that since the time of the divorce, the father has threatened her life. She and the son fled New York to a safe house and have kept their whereabouts from the father. The father subsequently filed a petition for visitation with the child, but the petition was denied by the New York family court. The mother also alleged that at the time she filed the petition to terminate the father's parental rights, a permanent order of protection for her and the child was in effect.

[1] Counsel for the son adopted the positions taken by the father at trial and on appeal.

Moreover, she alleged that the father was a substance abuser, who has been incarcerated several times since the date of the parties' marriage. The mother alleged her belief that the only way that she and the child could be safe was to terminate the father's parental rights. She sought to terminate the father's parental rights on the grounds of abandonment, denial of care, guidance or control necessary for the child's well-being and no ongoing parent-child relationship pursuant to § 45a-717 (g).

On May 9, 2007, the Probate Court, *Hon. Brian T. Mahon*, asked the department of children and families (department) to investigate and to provide a written report on or before August 7, 2007. On December 18, 2007, the Probate Court granted the father's motion to transfer the termination proceedings to the Superior Court for juvenile matters. The Superior Court for juvenile matters subsequently transferred the matter to the Child Protection Session. On September 4, 2008, the father appeared in Superior Court with counsel, waived any defects in service, waived his advisement and entered a pro forma denial of the allegations of the petition. The father also requested, and the mother agreed, that the child undergo a psychological evaluation. On October 2, 2008, counsel for the father informed the court that the father was being detained by the United States Bureau of Immigration and Customs Enforcement (immigration service).[2]

---

[2] The father was being detained by the immigration service pending a review of his immigration status. He had been born in Colombia but had lived in the United States since he was five years old. He has extensive family in Colombia, which he last visited in 1988. In 2005, the father was convicted of unauthorized use of a motor vehicle and placed on probation. In 2007, he violated his probation by engaging in an assault. The immigration service treated his probation violation as a second offense involving moral turpitude, subjecting him to possible deportation. The father anticipated that a decision concerning his deportation would be made by the end of April, 2009.

Trial on the termination petition commenced, as scheduled, on January 21, 2009. The mother was present with counsel. The father, who participated via telephone from New Mexico where he was being detained, was represented by counsel. The child's counsel also was present.

The mother called the father as her first witness.[3] The father testified that he had been arrested eight to ten times but that he had been incarcerated only three times. Two of his incarcerations were the result of his having been charged with violating the protective orders in favor of the mother, but he claimed that he was never found guilty of violating a protective order. Until the immigration service detained him in New Mexico, he had been incarcerated primarily in New York state. He had been arrested for assault in the third degree, shoplifting, unauthorized use of a motor vehicle, at least twice, and motor vehicle moving violations. The reasons for his arrests have never involved minor children. He was incarcerated for three months for the unauthorized use of a motor vehicle, three days for shoplifting, thirty days for assault in the third degree and eight months for violation of probation.

The father last saw his son when the child was three or four years old. According to the father, the child had a close relationship with the father's family, but the relationship ended in 2003. The father blamed the mother for getting a protective order against the father's sisters because she feared they would help the father take the child to Colombia. The father believes that the

---

[3] The court found that the length of the father's availability by telephone was controlled by the personnel at the detention center. The court and counsel were uncertain how long the father would be available by telephone and agreed to call witnesses in a manner that took best advantage of the father's unpredictable telephone availability. On January 22, 2009, the father was denied telephone access due to the length of time he had been on the telephone the prior day.

mother deliberately kept the child away from him for the past five years. The father stated that he "utilized a lot of court processes to find the mother and that even the New York court tried to help him." He also claimed that he bought gifts and prayers for his son but that under the protective orders, he was not permitted to send them to the child. The father has used alcohol and drugs, including cocaine, crack and marijuana, and was once arrested for possession of illegal substances. He claimed that he never used alcohol prior to visiting the child. The father is aware that his son, whose given name is the same as the father's, wants to change his name.

Ryan E. Williams, a department employee, prepared the report requested of the department and testified at trial. At the time of trial, Williams had visited with the child fourteen times and spoken to him outside of the mother's presence. Williams had visited the home that the child shared with the mother and had spoken with the child's pediatrician, school personnel and therapist. Williams wrote in his report, which was admitted into evidence: "According to [the mother], she has relocated her residence often as a result of trying to avoid [the father's] unorthodox, erratic and threatening behaviors toward her." The child's pediatrician reported that the child was in good health, and he had no concerns regarding the mother's ability to care for the child. School personnel reported that the child was a good student with no behavioral issues, and they had no concerns about the mother's ability to care for the child.

With respect to the child, Williams observed that the child "present[ed] as an engaging and articulate youngster who enjoys playing music, especially the violin. [The child] currently attends therapy in order to address issues concerning [the] father." According to the child's therapist, in November, 2007, the child was afraid of

the father and was "apprehensive about recalling memories of [the] father." In the year that the child had been in therapy, the child had made progress overcoming anxiety about the father. The therapist thought that the child did not want to have contact with the father and that the child "sense[d] [the] mother's anxieties about [the father]." Williams indicated that the therapist believed that termination of the father's parental rights would be in the child's best interest.

According to Williams, the child informed him that he had no ongoing relationship with the father and that because of the father's threats to the mother that made her afraid, the child did not want to have a relationship with the father. The child stated that he "would feel safer if he knew [the] father could have no involvement with [him] or [the] mother." The child also told Williams that the father did not follow through with his promises and that the father missed many visits. The child also told Williams that he wanted to live with the mother to the exclusion of the father. The child and the father have the same first name, and the child wants to change his name so he will not be associated with the father.

With respect to the mother, Williams reported that she told him that the father had mentally and emotionally tormented her during their marriage and that she has been in counseling since 2001. The mother also is a client of the child's therapist, who described the mother "as a conscientious caretaker who has [the child's] . . . health and well-being as her main priority." The therapist told Williams that she did not believe that it was a good idea for the child to reestablish contact with the father.

Williams spoke to the father, who was incarcerated at Riker's Island Prison in New York, in November, 2007. The father stated that his marriage to the mother ended "as a result of his substance abuse and mental

health issues." According to Williams, the father "seemed to minimize the issues that caused the end of his marriage" and stated that the mother knew "the extent of my problem." The father admitted that he had left the mother and child on weekends. The father also admitted that he had problems that may have led the mother to keep the child from him. The father said that he was "not an evil person" and that despite what he had done in the past, he would like to have a relationship with his son.

The department recommended that the father's parental rights be terminated. The recommendation was based on the fact that the father "has failed to maintain a reasonable degree of interest, concern or responsibility for [the child's] welfare based on a pattern of volitional inconsistent, irresponsible, threatening and criminal behavior that has had a negative [e]ffect on [the child's] psycho-emotional well being."[4] The department's "recommendation is further based on the fact that [the child] repeatedly reported to [Williams] that he has no desire to have a relationship with his father, based on [the father's] inconsistent, unorthodox, threatening and criminal behavior. . . . This [d]epartment's recommendation is believed to be in [the child's] best interests because allowing the re-establishment of the relationship between [the child] and [the

---

[4] The department also recommended termination "based on the fact that [the child] has been denied the care, guidance, or control necessary for his physical, educational, moral, or emotional well-being by reason of acts of parental commission or omission by [the father], as evidenced by his inability to maintain consistent visitation with [the child], unresolved substance abuse issues that have had a negative psycho-emotional impact on the child, threatening behaviors, and criminal acts that have cause his current incarceration.

"There is also no ongoing relationship between [the father] and [the child] as a result of the . . . father's poor choices as they pertain to parenting his [child], and it appears as if to allow further time for the establishment or reestablishment of the parent/child relationship would be detrimental to [the child's] best interests, as [the father's] actions appear to be indicative of one who is irresponsible, emotionally neglectful, and indifferent as to what is in his child's best interests."

father] would present a detriment to the child's psycho-emotional well being."

Williams also spoke with Bridget Reilly, a domestic violence consultant, who had reviewed the parties' LINK history.[5] In the case consultation, Reilly stated that "[d]ue to [the father's] threatening, emotional and psychological abuse, [the mother] has changed her name and [the child's] name for safety purposes at the recommendation of her former attorney." Reilly identified the following pattern of the father's coercive control and behaviors that created harm for the child and family: threatening to kill the mother and child, threatening to kill himself, threatening to physically harm the mother and child, threatening that his "boys" will harm the mother and child, threatening to take the child from the mother, causing the mother to lose her job due to his threatening and erratic behaviors and threats to the mother and her coworkers, isolating the mother from family and friends by threatening to harm them and having his friends threaten them, causing the mother to purchase another car because she was warned that there was a tracking device in the one that she owned, repeatedly lying to the mother and driving fast and erratically when the mother and child were in the car to frighten them. The father's verbal abuse included name-calling and put-downs.

The father stalked the mother by following her in his car and following her and the child after they had moved several times. The mother left New York to get away from the father. Due to the father's threatening behaviors, the mother will not go to New York state, which prevents her from going to medical specialists and compromises her career because she cannot take assignments in New York. Due to the father's behaviors, the

---

[5] LINK is the name of the department's computer information base where domestic violence reports are stored and shared.

mother constantly is on the lookout for him and his friends, which causes her stress and anxiety.

Reilly found that the mother made the following efforts to support and to provide for the safety and well-being of the child. She safely planned for herself and the child by leaving the father, seeking orders of protection in the state of New York, applying for and receiving a long-standing restraining order in this state, changing her name and the child's name and moving several times. The mother is the primary caretaker for the child. She has sought therapy for herself and the child and is appropriately attentive and supportive of the child's healing process. The mother has sought to maintain a sense of normalcy and stability for the child, despite the father's behaviors, by promoting extracurricular activities for the child such as camp, sports and music. The mother has a history of employment and has supported herself and the child without any financial support from the father. Despite the father's attempts to isolate the mother, the mother has maintained a support system.

Reilly also identified the adverse impact of the father's behavior on the child. The father has not visited his son for years and has not provided any financial support. When the father was granted supervised visitation, he often missed visits or showed up late. Visitation was stopped because the father behaved inappropriately with the child during visits, including dropping the child on one occasion. The child was upset that the father did not apologize for having dropped him and thought that his father had dropped him on purpose. When the father telephoned his son, the child imitated a dog, barking, growling, running and hiding to avoid talking to his father. When the mother was driving the child to visit his father, the child would take off his seat belt to get his mother to stop the car. The child wants to change his name because he does not want

to be like his father and tells his friends that he does not have a father. The child constantly is on the lookout to make sure his father is not around. Due to stress, the child suffers from stomach pains and loss of appetite. The child believes that he must take karate lessons so he can fight his father if the father tries to hurt him and the mother.

Reilly identified the following other facts that affect the mother's and child's risks and vulnerability. The father has a history of using crack cocaine, mental health problems and criminal behavior. The father has access to firearms and was arrested in January, 2007, while in possession of a firearm. At the time Reilly was completing her report, the father was incarcerated. Reilly concluded "from the LINK search and additional information provided by . . . Williams that [the father] continues to pose a significant risk to [the mother] and [child] and a termination of his parental rights is in the best interest of [the child's] physical and emotional well-being."

The mother testified that she and the father were married in 1999. She left the father in 2002 because of his drug addiction and his failure to complete successfully rehabilitation treatment. In August, 2001, she asserted, the father tried to kill her by crashing the car he was driving. He drove at speeds of 110 miles per hour, did not stop for stop signs or traffic signals. The father told the mother that she "wanted to be dead." The mother screamed out the car window until the police stopped the car. On another occasion, the father threatened her and her boss.

Due to the father's drug addiction, threats of suicide and threats to take the child away from her, the mother and the father agreed that the father's visits with the child would be supervised. At first, in December, 2002, the father visited the child regularly, but he began to

miss visits without giving notice. He did not acknowledge the child's third birthday in May, 2003. As early as 2003, the child did not want to be associated with his father and wanted to change his name.

Pursuant to an order of the court, the father's telephone conversations with the child were recorded so that the court could review them to determine whether the father was speaking appropriately to the child. The court determined that portions of the father's conversations were inappropriate. When the father was incarcerated, he made no effort to renew telephone communication with his son.

After the father was released from incarceration, supervised visits, instead of telephone contact with the child, were arranged. The visits resumed in November, 2003, stopped and resumed in February, 2004. The visits were then stopped and resumed in August, 2004. Each set of visits lasted only a few weeks before the father ceased them.

In November, 2004, the father telephoned the mother to say that he was near a train and asked whether he should jump in front of it or go to a police station. He admitted to the mother that he had stolen another vehicle. He also told the mother that "she did not know what could happen to her going to and from" the child's school. The father threatened "to go postal."

The mother obtained orders of protection against the father. During one of the hearings, the father threatened her. The court suggested that the mother go to a shelter. The mother was unable to work because the father's threats made it dangerous to do so. The mother received compensation from a program for the victims of crime. After making the threats, the father was incarcerated and later released on probation. The mother obtained an order of protection that covered "everywhere she was." The father violated those orders by contacting

her. The father said that the mother should be careful, that he could come and take the child and that she should keep her eyes open because people could follow her. The mother reported the threats to her attorney.

Prior to the parties' marriage, the father had joined Alcoholics Anonymous. When the mother became pregnant, the father disappeared on weekends to use crack cocaine. When the child was born, the father was scheduled to take the mother and child home from the hospital but did not appear. One of the father's sisters had to bring him to the hospital. There were periods of time when the father could not be found and when he made no effort to contact his son. To deal with his addiction problems, the father sought treatment without success in a variety of institutions in New York and Connecticut.

According to the mother, the father told her that he had "boys" who could take care of what he needed. The father had a confrontation with a boss at his then place of employment. Approximately six months passed, and the father told the mother that "his boys had taken care of the situation" and that he would not have any more problems with his boss.

The mother denied that she prevented the father from having contact with their child or that she had hidden the child from his father, although she admitted that she does not want the father to know where she and the child live. In 2002, the mother moved to Connecticut to live with the child's maternal grandmother, whose address the father knew, but from 2002 until 2009, the mother did not tell the father where she and the child were living. She and the child resided in a battered women's shelter between April and July, 2005. There was no court order requiring her to provide the father with her address, and all communication was to take place through the parties' attorneys. The court found attached to the mother's petition to terminate the

father's parental rights a New York court order that there was "a full stay away order" against the father in effect through January 6, 2008.[6]

Following their divorce, the mother established a bank account into which the father was to deposit funds

[6] On October 10, 2007, the clerk of the Probate Court date stamped a copy of an order entered in the office of the clerk of the family court of the state of New York in the county of Westchester. The decision of Hon. Thomas R. Daly, states in part: "[The father] filed for enforcement of an Order of Custody/Visitation. [The mother] submitted the within motion to dismiss on the basis that the Court lacks subject matter jurisdiction. The documents before the Court suggest that [the mother] filed a proceeding in Connecticut. . . .

"On or about April 11, 2003, the parties entered into a Consent Order of Custody and Visitation. The [mother] was granted permanent sole legal and physical custody of the child at issue . . . . The order further granted the [father] supervised visitation. The order provided that if the petitioner missed a visit without calling to cancel, he was to submit to a urine test within seventy-two hours of the scheduled visit. Pursuant to the order, [the father's] visitation would be suspended if he failed to submit to the urine test, or, if the test results were positive for alcohol or drugs. A suspension or termination of [the father's] visitation may only be restored by further order of the Court.

"[The mother] alleges that in May, 2003, [the father's] visitation was suspended after he missed a visit without cancellation and failed to appear for a urine test pursuant to the order. [The mother] further states that in February, 2004, [the father] sought to reinstate visitation with the child. [The mother] indicates that numerous temporary orders of supervised visitation were provided to [the father] and each time, visitation was terminated due to 'uncooperative behavior or non-compliance with the rules of the agency.' [The mother] subsequently filed a Family Offense Proceeding, and [the father] filed for a Modification of Custody and Visitation. The matter was transferred to this Court in or about June, 2005.

"On or about January 6, 2006, a Permanent Order of Protection was issued against [the father] for [the mother] and the subject child . . . . The Order of Protection includes a full stay away order and is in effect until January 6, 2008. The [father's] modification petition was denied.

"The instant petition was filed on approximately May 15, 2007. The . . . father seeks to modify the Order of Custody/Visitation. [The mother] made a limited appearance with counsel for the purpose of submitting the present motion to dismiss." (Citation omitted.)

Judge Daly dismissed the father's petition to modify custody/visitation for lack of jurisdiction. The court found "that an action was commenced in the State of Connecticut approximately one month prior to the commencement of the within action [and] that New York no longer has exclusive,

for the child's support. The father was present in court when the account was discussed and the matter decided. After two years had passed, the mother was told to close the account because the father had not made any deposits in the account. During the numerous court proceedings, the mother was represented by counsel. The father made no efforts, through counsel, to send the child letters, requests for telephone calls or visits. The father has not inquired about the child's health or well-being, schooling or extracurricular activities.

According to the mother, the child does not want to visit his father or speak to him on the telephone. She claimed that the child is "driving this." It is the child who does not want to have contact with his father, as his father makes the child feel guilty for being who he is, and the child has not done anything wrong. According to the mother, the child blames himself, but it is the father who has the problems.

Eric Frazer, a court-appointed psychologist, conducted an evaluation of the child and testified at trial.[7]

continuing jurisdiction over this matter. Thus, Connecticut is free to entertain jurisdiction over custody and visitation of the subject child."

[7] The parties met with the court services officer to determine the questions to which the psychologist should respond. The memorandum to the psychologist, which was prepared by counsel for the father, was filed on September 15, 2008, and states:

"HISTORY

"This is a probate court action brought by the mother asking the court to terminate the parental rights of the father. The [commissioner of children and families] is not a party to this matter.

"This 8 year-old child has had no contact with his father since 2004. The mother moved from NY in that year to CT and changed her name and the name of their son. She claimed the father represented a danger to the child. The father disputes this and claims that his supervised visits with the child were appropriate until they were ended by the mother's moving. The mother has been the sole custodian of the child since their divorce in 2002.

"The parties hope that the results of a professionally-guided clinical interview with the child will resolve the issue of whether re-initiating contact with his father would be inimical to the child. The following assumptions may be made:

The court qualified Frazer as an expert in the field of forensic psychology, custody evaluations and parental alienation. Frazer met with the child once, outside the presence of the mother or father. Frazer defined parental alienation "as a circumstance where one parent portrays the other parent in a negative light, and the child takes note of such portrayal. The child has less or no contact with the alienated parent based on the perception put forth by the other parent."

Frazer found that the child portrayed the father in a somewhat confused way with altering perceptions. The child believes that his father was to be feared, that his father caused him to bump his head and that his father was going to abduct him. Frazer concluded that the child had formulated opinions about his father on the basis of what his mother had told him. According to Frazer, the child had positive recollections of some interactions with his father, such as when his father brought him toys or they played on a computer in a

"—both parents love their son

"—both parents will acknowledge and accept the court's finding of the best interest of the child

"—the parents have widely differing views of their effectiveness as parents of their son

"—the mother wishes to terminate the parental rights of the father thereby legally ending his legal rights and obligations to the child

"—the father wishes to maintain his obligations and rights to the child

"—both parents are represented by counsel and fully understand their rights in this proceeding.

"QUESTIONS

"1. What is the status of the child's memory of his father?

"2. What does the child believe about his father?

"3. How did the child come to hold these beliefs?

"4. Does it make any difference how the child came to these beliefs in view of the totality of the circumstances that has resulted in a separation of the father and the child for more than half the child's life?

"The parties have knowingly limited the information available to the evaluator for this interview. They did this in the belief that if the child had no positive memories of his father that given the length of alienation and the age of the child a reunification may not be appropriate."

library. Frazer observed that the child has a polarized view of his father. The child was afraid to have contact with his father but thought that if the meeting were held in a safe place, such as a doctor's office, it would be okay to have contact with him.

During Frazer's evaluation, the child narrated a co-parenting fantasy in which the mother prepared dinner and the father helped the child with his homework. Frazer concluded that the child wanted to have some type of relationship with the father and that the child could envision the nature of such a relationship; the child had at least some positive memories of the father, as the child disclosed positive experiences rooted in contextual information that the child portrayed positively and projected into positive experiences. The idea that the mother reinforced the child's positive memories of the father is completely inconsistent with the mother's approach to the child and the father. The child's references to a father or father figure in his fantasy are to his biological father.

At the conclusion of the evidence, the court ordered that transcripts be made available to the parties and ordered the parties to submit posttrial briefs three weeks after the transcripts were available. The court issued an amended memorandum of decision on March 9, 2009. The court found by clear and convincing evidence that the mother had proven with respect to the father that "the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern *or* responsibility as to the welfare of the child . . . ." (Emphasis in original; internal quotation marks omitted.); see also General Statutes § 45a-717 (g) (2) (A).[8] In making its finding,

---

[8] The court found that the mother failed to prove that the child had been denied, by reason of parental acts of commission or omission, the care, guidance or control necessary for the child's well-being and that she failed to prove that there was no ongoing parent-child relationship. See General Statutes § 45a-717 (g).

the court noted, pursuant to Practice Book § 35a-7 (a), that "[i]n the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment . . . ." The court noted that "[a]bandonment focuses on the parent's conduct." *In re Kezia M.*, supra, 33 Conn. App. 17. The court found that as of the date of the mother's petition to terminate the father's parental rights, March 19, 2007, the father had abandoned the child, including failing to provide financial support.[9]

The court then turned to the dispositional phase of a termination of parental rights adjudication and made the findings required by § 45a-717 (h). The court concluded that the "father's mental health issues, his history of substance abuse, his emotional abuse, threats and other behavior intended to control, frighten and at times terrorize the mother have made it impossible for him to have a relationship with [the child] because, inter alia, he has destroyed his relationship with [the child's] primary caretaker, the mother. It is thus in [the child's] best interest to terminate the father's parental rights." In reaching this conclusion, the court noted that "[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008). The court ultimately found that it was in the best interest of the child to terminate the father's parental rights. The court ordered that the mother shall be the child's sole guardian. The father timely filed an appeal.

I

The father claims that the court's findings that (1) he had abandoned the child and (2) it was in the best

---

[9] The court also found that the father's abandonment continued through the end of the termination of parental rights trial.

interest of the child to terminate his parental rights were clearly erroneous. We do not agree.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported." (Internal quotation marks omitted.) *In re Cheila R.*, 112 Conn. App. 582, 589, 963 A.2d 1014 (2009). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 558–59, 979 A.2d 469 (2009).

"The legal framework for deciding termination petitions is well established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in [General Statutes] § 17a-112 [or § 45a-717 (g)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase,

the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, supra, 285 Conn. 487–88.

A

The father's first claim is that the court's finding that he abandoned the child is clearly erroneous.[10] We do not agree.

Section § 45a-717 (g) provides in relevant part: "[T]he court may appoint a statutory parent, if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ." In this case, we conclude that the court's factual findings, by clear and convincing evidence, support its conclusion that the father abandoned the child by failing to maintain a reasonable degree of

---

[10] We understand the father's claim to be that, when a parent has been prevented from having contact with a child, a finding of abandonment seems anomalous. Termination on the ground of abandonment when one parent alienates the child from the other parent also raises significant issues. Given the circumstances of this case, however, the fact that the mother took steps to protect herself and the parties' child from the father does not undermine the court's finding of abandonment. We note that there is no finding that the mother actively impeded the father's visits with the child. There are findings that the father had been subject to court orders of protection, including one that was in effect when the termination petition was filed, he knew where his mother-in-law lived and the mother had been forced to seek refuge in a shelter as a consequence of the father's behavior. Aside and apart from his claim that he was prevented from seeing his child, the father's conduct, viewed as a whole, including his threatening behavior, his disruptive behavior and his failure to provide financial support for his child, do not support the proposition that he maintained a reasonable degree of interest, concern or responsibility as to the welfare of his child.

interest, concern or responsibility as to the child's welfare.

"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . [Section] 45a-717 [g][11] defines abandonment as the fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .

"*Section 45a-717 [(g) (2) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern. . . .*

"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; emphasis added; internal quotation marks omitted.) *In re Ashley E.*, 62 Conn. App. 307, 314–15, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). While

---

[11] Section 45a-717 (g) previously was codified in § 45a-717 (f). See *In re Ashley E.*, 62 Conn. App. 307, 312–13, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001).

the father's imprisonment alone does not constitute abandonment, it does not excuse his failure to attempt either to contact or to visit his son. See id., 315.

We conclude, on the basis of our review of the record, that the court's finding that the father had abandoned the child was not clearly erroneous. Although the father suffers from substance abuse and mental health issues, he has engaged in criminal activity that caused him to be incarcerated and detained by the immigration service during the child's life. While he was in prison, the father failed to take advantage of programs that would have permitted him to maintain contact with the child. The father's sporadic visits and telephone calls do not constitute the type of interest, concern or responsibility expected of a father who has maintained a reasonable degree of interest and concern in his child. Not only did the father fail to provide financial support and to maintain regular visits and communication with the child, but also his threatening conduct toward the mother compelled her to secure orders of protection, precluding him from having contact with his son. Although the father has expressed a desire to have a positive relationship with his son, by his conduct, he has abandoned the child by failing to be a responsible parent in the manner contemplated by our child welfare statutes.

## B

The father's second claim is that the court's finding that termination of his parental rights was in the best interest of his son was clearly erroneous. We disagree.

"If the court finds that the petitioner has proven by clear and convincing evidence that one of the statutory grounds for termination of parental rights exists, it must then determine whether termination is in the best interests of the child. . . . The best interests of the child

include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 45a-717 (h)]." (Citations omitted; internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 763–64, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008).

After finding that the father had abandoned the child, the court made the factual findings required by § 45a-717 (h).[12] The court found that the child is eight years

---

[12] General Statutes § 45a-717 (h) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

and ten months old and that it was unaware of any services offered to the father and child by a child-placing agency to facilitate the reunion of the child with the father. The court also was unaware of any court order entered into and agreed on by any child-placing agency and the father. The court found that the child is very closely bonded and loyal to his mother. The child does not have many independent memories of his father but has some hopes, dreams and fantasies about how things would be if he could have safe, supervised visits with his father. The child shares his mother's fears about the father because such fears are of continuing concern to the mother.

Moreover, the court found that since the parties separated, the father has not been able to adjust his circumstances, conduct or conditions to maintain consistent visits and other contact with his son due to his substance abuse, mental health issues and behavior, including, but not limited to, having made threats against the mother, threatening to abduct the child, being incarcerated and detained due to criminal activity and having protective orders entered against him. The father has not been prevented from maintaining a meaningful relationship with the child by the *unreasonable* act or conduct of the mother. The court found that the "father's mental health issues, his history of substance abuse, his emotional abuse, threats and other behavior intended to control, frighten and at times to terrorize the mother have made it impossible for him to have a relationship with [the child] because, inter alia, he has destroyed his relationship with [the child's] primary caretaker, the mother."

The court considered the best interest of the child in terms of the child's maintaining a legal relationship with his father and whether it is in the child's best interest to be reunited with his father, including whether the father, in a noncustodial way, reasonably

could be expected and relied on to provide the safe, secure, nurturing, stable and permanent environment idealized in the statutes and case law and the child's "interests in sustained growth, development, well-being, and continuity and stability of . . . environment." (Internal quotation marks omitted.) *In re Ryan R.*, 102 Conn. App. 608, 625–26, 926 A.2d 690, cert. denied, 284 Conn. 923, 924, 933 A.2d 724 (2007). The court found, however, that it was in the best interest of the child to terminate the father's parental rights. On the basis of our review of the record, we conclude that the court's finding that it was in the child's best interest to terminate the father's parental rights was not clearly erroneous.

## II

The father's third claim is that the court violated his right to due process by denying his motion for a continuance on the second day of trial when the immigration service denied him access to a telephone so he could participate in the trial. We do not agree.

The father's claim is an issue of law for which our standard of review is plenary. See *In re Shaquanna M.*, 61 Conn. App. 592, 600, 767 A.2d 155 (2001).

Several months prior to the start of trial, which was scheduled to and did begin on January 21, 2009, the father's counsel informed the court that the father was being detained by the immigration service. The father was detained after he was convicted of a second felony that he had committed while termination proceedings were pending. The father was able to participate in the entire first day of the termination trial via telephone. Apparently, at the start of trial, the court, counsel and the parties were unaware of the amount of time that the father would be available via telephone. The uncertainty of the father's availability was taken into account

in the ordering of the testimony of the witnesses. The mother's counsel called the father as her first witness.

The transcript of the second day of trial reflects that both the court and the father's counsel had been informed by the immigration service that the father would not have access to a telephone that day. The father's counsel asked the court to continue trial until the father's telephone privileges were restored. Counsel for the mother objected, stating that the father was being detained as a consequence of his own volitional acts. The father's counsel was unable to inform the court when the father would be available by telephone again. The court denied the motion for a continuance, noting that "the place where the father is in detention . . . is very unhappy about the amount of time that the father took on the telephone yesterday. And I don't want to speculate, but, if, in fact, you were able to arrange anything, it wouldn't be for a significant period of time, seemingly based on the report received or the message received by the [court] clerk."

Thereafter, counsel for the father called his only witness, Frazer, the court-appointed psychologist.[13] Frazer had prepared a report that was filed in court on September 30, 2008. At the conclusion of the evidence, the court stated that the father's counsel could make the transcript available to the father subject to the confidentiality required by General Statutes § 46b-124. The parties were to submit their posttrial briefs three weeks following their receipt of the transcript.[14] Thereafter, the father filed no motions or requests to open the evidence.

---

[13] Frazer, whose services were being provided by the state, was in the courtroom ready to testify on the second day of trial.

[14] Addressing the father's counsel, the court stated, "[I]f you need to share the transcript with your client, as long as he understands the confidentiality, given your circumstances, it can go out to New Mexico or a copy of it can go out to New Mexico."

Ordinarily, we resolve claims concerning the denial of a motion for a continuance under the abuse of discretion standard. See *Heyse* v. *Case*, 114 Conn. App. 640, 654, 971 A.2d 699, cert. denied, 293 Conn. 905, 976 A.2d 705 (2009). The substance of the father's claim, however, concerns due process. We resolve due process claims pursuant to *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

"The United States Supreme Court analyzes claims of procedural due process in accordance with the three part test set forth in [*Mathews* v. *Eldridge*, supra, 424 U.S. 334–35]. The Connecticut Supreme Court uses the same test. *Sassone* v. *Lepore*, 226 Conn. 773, 781, 629 A.2d 357 (1993). That test requires a consideration of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Santana* v. *Hartford*, 94 Conn. App. 445, 469–70, 894 A.2d 307 (2006), aff'd, 282 Conn. 19, 918 A.2d 267 (2007). Stated differently, we must determine if the private interest of the father in the companionship, love and control of the child is at risk of being erroneously terminated because of the lack of an adequate procedural safeguard that could be provided for him without disregarding the state's interest in the well-being of the child and the fiscal and administrative burden on the state. See *In re Alexander V.*, 25 Conn. App. 741, 744–45, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992); see also *In re Lukas*, 120 Conn. App. 465, 473–74, 992 A.2d 1142 (2010).

"Due process does not mandate full evidentiary hearings on all matters, and not all situations calling for

procedural safeguards call for the same kind of procedure. . . . So long as the procedure afforded adequately protects the individual interests at stake, there is no reason to impose substantially greater burdens . . . under the guise of due process." (Citation omitted; internal quotation marks omitted.) *GMAC Mortgage Corp.* v. *Glenn*, 103 Conn. App. 264, 275, 931 A.2d 290 (2007). "The bottom-line question is whether the denial rendered the [proceeding] fundamentally unfair in view of the *Mathews* factors." *In re Shaquanna M.*, supra, 61 Conn. App. 606. The balancing test of *Mathews* v. *Eldridge*, supra, 424 U.S. 334–35, does not support the father's claim of a due process violation for the following reasons.

The facts of this case are similar to those of the putative father in the case of *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 446 A.2d 808 (1982), which guides us in the resolution of the father's due process claim here. In *In re Juvenile Appeal (Docket No. 10155)*, the putative father left the state to avoid an anticipated arrest for assault. Id., 433. He subsequently was arrested in California on an unrelated charge, convicted and imprisoned. Id. The putative father tentatively was scheduled to be released in July, 1980. Id. The child in that case, Jesse, was cared for by his maternal grandmother after his mother's death. Id. The grandmother later decided that she was unable to care for Jesse and asked the state to find a permanent placement for him. Id., 434. The state subsequently sought to terminate the parental rights of the putative father. Id. The putative father sought a continuance of the termination trial, which occurred on December 20, 1979, until he was released from prison. Id. The motion for a continuance was denied. Id.

On appeal to our Supreme Court, the putative father claimed that the denial of his motion for a continuance so that he could be present at the trial was a denial of

his right to due process. Id. In applying the *Mathews* balancing test, our Supreme Court concluded that the putative father's "interest in retaining his parental rights to his son, is clearly both compelling and constitutionally protected." Id., 436. So, too, in this case, are the father's parental rights as to the child both compelling and constitutionally protected.

As in the case of the putative father in *In re Juvenile Appeal (Docket No. 10155)*, the second factor under *Mathews*, the risk of error occasioned by the father's absence from the second day of the hearing, is crucial to his claim.[15] See id. In *In re Juvenile Appeal (Docket No. 10155)*, "the state's principal witness, Jesse's maternal grandmother, testified and was cross-examined by the [putative father's] counsel. A complete transcript of that hearing was then sent to the [putative father], who discussed the witness' testimony with his counsel by telephone." Id., 437. "Although the court had offered [the putative father] the option of deferring cross-examination [of the maternal grandmother] entirely until the [putative father] had an opportunity to see the transcript, he elected instead to have his counsel cross-examine immediately with a reserved right to ask additional questions at the second hearing. Since the [putative father] did not, in fact, avail himself of this opportunity, we may assume that he was satisfied with the results of the initial cross-examination."[16] Id., 437–38. Our Supreme Court found "no link between

---

[15] In the case of *In re Juvenile Appeal (Docket No. 10155)*, the putative father was unable to participate in the termination trial by any means, and he was not present. *In re Juvenile Appeal (Docket No. 10155)*, supra, 187 Conn. 436.

[16] "Further, there is no claim that the [putative father's] counsel was an inadequate representative or that the cross-examination that occurred was in any way defective or incomplete." *In re Juvenile Appeal (Docket No. 10155)*, supra, 187 Conn. 438. The father here has not claimed that his counsel failed to represent him adequately.

[the putative father's] absence during cross-examination and an increased risk of error"; id., 438; in the outcome.

On appeal, the putative father argued that due to his absence at trial, he was not able to assist in cross-examining Jesse's maternal grandmother. Id., 437. Our Supreme Court found that argument wanting because the putative father failed to establish what assistance he might have provided his counsel had he been present. Id. The putative father acknowledged that he had had adequate time to peruse the testimony of Jesse's maternal grandmother and to consult with his attorney; id.; and he failed to take advantage of the court's offer to defer cross-examination until he had reviewed the transcript. Our Supreme Court "assumed that [the putative father] was satisfied with the results of the initial cross-examination." Id., 438.

The father in the case before us also has failed to explain how his absence during the second day of trial when Frazer, his own witness, testified about his evaluation of the child, not the father, violated his right to due process. Frazer's report was available to the parties some months before trial, and we presume that the father had an opportunity to review it and to discuss it with his counsel.[17] The court made the trial transcript available to the father, and we presume that he had the opportunity to review it. The father filed no motions or requests to open the evidence to reexamine Frazer. Moreover, the court's termination of the father's parental rights is grounded, not in Frazer's testimony, but in its factual findings regarding the father's conduct, the child's best interest and its credibility determinations. We therefore find no discernible link between the

---

[17] The mother asserted in her brief that the father had an opportunity to review Frazer's report. The father failed to challenge this assertion in his reply brief.

father's absence during the second day of trial and an increased risk of error in the outcome. See id.

The third *Mathews* factor concerns "the function involved and the fiscal and administrative burdens placed on the government by securing the respondent's presence at the termination hearing . . . ." Id., 439. The government function in terminating parental rights "is an aspect of [the state's] role as parens patriae." Id. "It is important to note in this relation that the ultimate standard underlying the whole statutory scheme regulating child welfare is the best interest of the child." (Internal quotation marks omitted.) Id. "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care . . . ." General Statutes § 17a-101 (a). "Time is of the essence in child custody cases. . . . This furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment." (Citation omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Docket No. 10155)*, supra, 187 Conn. 439–40.

In this case, the balance tips in favor of the state's role in protecting the child. At the time of trial, the father was being detained by the immigration service after the father was convicted of a second felony involving moral turpitude. At the time the father asked for a continuance—on the second day of trial, when the witness who was being paid by the state was in the courtroom ready to testify—the father did not expect the immigration service to make a decision about his immigration status for several more months. The father's counsel also did not know when the father's telephone privileges would be restored. Under the circumstances, the court's desire to avoid potentially significant delay was appropriate.

"A motion for continuance is addressed to the discretion of the trial court, and a ruling on a motion for continuance will not be upset absent a showing of clear abuse of that discretion." *In re Juvenile Appeal (85-2)*, 3 Conn. App. 184, 189, 485 A.2d 1362 (1985). "In the absence of a mechanical test for determining when a denial of a continuance is so arbitrary as to violate due process, the answer must be found in the circumstances of the case, with particular emphasis on the reasons presented to the trial judge at the time the request is denied." Id. Our Supreme Court has "articulated a number of factors that appropriately may enter into an appellate court's review of a trial court's exercise of its discretion in denying a motion for a continuance. Although resistant to precise cataloguing, such factors revolve around the circumstances before the trial court at the time it rendered its decision, including: the timeliness of the request for continuance; the likely length of the delay, the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; [and] the defendant's personal responsibility for the timing of the request . . . ." (Internal quotation marks omitted.) *State v. Nelson*, 118 Conn. App. 831, 843, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010).

Under the circumstances of this case, the primary governmental interest the court had to consider was whether a trial delay was in the best interest of the child. The mother had filed the petition to terminate the father's parental rights in March, 2007. Thereafter the father filed a motion to transfer the matter to the juvenile division of the Superior Court and requested a psychological evaluation of the child. The father's counsel knew in October, 2008, that the father was

being detained and that the trial was scheduled to commence on January 21, 2009. The father was detained by the immigration service as a result of his criminal behavior that occurred while the petition to terminate his parental rights was pending. The father testified and heard the testimony presented during the first day of trial via telephone. The father's counsel offered an oral motion for a continuance on the second day of trial. Like the putative father in *In re Juvenile Appeal (Docket No. 10155)* who expected to be released from prison at some unknown time in the future, the father expected a decision about his immigration status to be made at an unknown time in the future. More seriously, the father faced the prospect of being deported, not just released from detention. Importantly, the court had to balance the rights the child had in a timely decision regarding permanency in his life.

The child was fearful of the father's threatening behavior, and the mother filed the petition to terminate the father's parental rights, in part, because the child wanted the threats that his father represented removed from his life. The court found the mother's testimony to be credible. We cannot say that a delay would have placed a severe financial burden on the state, but Frazer, a state paid witness, was in the courtroom prepared to testify. The financial burden to the state, however, pales in the face of the state's parens patriae interest in the best interest of the child. "Because of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." *In re Alexander V.*, supra, 25 Conn. App. 748.

On the basis of our review of the record and weighing of the three *Mathews* factors, we conclude that there was little risk of error as to the father's private interest created by his absence from the second day of trial "and the probable value, if any, of additional or substitute procedural safeguards . . . ." *In re Juvenile Appeal*

*(Docket No. 10155)*, supra, 187 Conn. 436. We conclude that the *Mathews* balancing test weighs in favor of the state under the facts of this case. We therefore cannot say that the denial of the father's motion for a continuance rendered the termination proceeding fundamentally unfair.

The judgment is affirmed.

In this opinion the other judges concurred.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.