******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE BACIANY R.*
(AC 39142)

Lavine, Beach and West, Js.

*Argued October 5—officially released October 26, 2016***

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Juvenile Matters, Randolph, J.)

*James P. Sexton*, assigned counsel, with whom were *Emily L. Graner Sexton*, assigned counsel, and, on the brief, *Marina L. Green*, assigned counsel, for the appellant (respondent).

*Pamela M. Magnano*, with whom, on the brief, was *Heather L. Perbeck*, for the appellee (petitioner).

*Opinion*

LAVINE, J. The respondent father, Baciany R., appeals from the judgment of the trial court terminating his parental rights as to his son, Baciany R. (child). On appeal, the respondent claims that the court improperly concluded that there was clear and convincing evidence that termination of his parental rights was in the best interest of the child. We affirm the judgment of the trial court.

On October 10, 2013, the petitioner, Stephanie P., filed a termination of parental rights petition in the Court of Probate for the district of Stamford seeking to terminate the parental rights of the respondent on the grounds of abandonment and no ongoing parent-child relationship. See General Statutes § 45a-717 (g).[1] The termination petition was transferred to the Superior Court for Juvenile Matters in Stamford. The matter was tried to the court in March, 2016; the court issued a memorandum of decision on March 17, 2016. The court issued an articulation on June 21, 2016.

In its memorandum of decision and articulation, the court made the following findings of fact. At the time of trial, the child was four and one-half years old. Between December, 2011, and May, 2012, the respondent regularly visited the child and a few times bought the child baby items. He has not seen the child, however, since the child was six months old. The petitioner does not talk to the child about the respondent, and the child does not know that the respondent exists and would not recognize him.

The court found that the child has a comfortable, contented, and loving relationship with the petitioner. They play together easily and enjoy one another's company. The petitioner provides the child with a balance of fun, learning, and limits. When he engages with the petitioner, the child is polite and curious. The child has a happy temperament and is not especially given to tantrums or angry outbursts. He has affectionate relationships with the petitioner, his maternal grandparents and aunt, and has age appropriate personal habits and self-care. The child relates well to other children. He has a variety of interests, and a strong capacity to focus on activities and to learn new things. He persists when toys and games present a challenge. His verbal skills and vocabulary are excellent. The child exhibits no serious psychopathy or significant emotional or behavioral concerns.

Since 2012, the respondent has been incarcerated for possession of a gun and expects to be discharged in 2018. He was incarcerated between 2006 and 2009 for firing a gun that injured another person. The petitioner had a brief intimate relationship with the respondent, who impregnated her. At the time the petitioner was pregnant with the child, the respondent impregnated

another woman, whom he later married. The respondent plans to resume living with the other woman when he is released from prison.

The court also found that the respondent had a troubled relationship with his family. His father is unknown, and the respondent no longer sees the woman in Haiti who raised him until he was thirteen. He believed that the woman with whom he resided in the United States from the age of thirteen was his mother, but she told him when he was an adult that she was not his mother and put him out of the house.

The respondent wishes to have a loving relationship with the child, but he has not been able to follow a law-abiding path. He does not want the child to believe that he has abandoned him. The respondent, however, is "disconnected" from his emotions and pretends that he is unaffected by his own family's rejection of him. The court found that the respondent needs to resolve these issues through counseling, but until the time of trial, the respondent was unwilling to seek counseling. Until the respondent works through his emotions concerning his feelings of rejection, he will not be able to develop a healthy relationship with the child. The respondent also is unfamiliar with parenting.

Moreover, the respondent has provided almost no financial support for the child. After the child was born, the respondent did not pay for baby wipes, diapers, or formula. He failed to purchase clothing for the child on a regular basis. He has not paid for any of the child's education expenses. Inasmuch as the respondent is incarcerated, he has no income. The court did not credit the respondent's testimony that he has ready employment available once he is released from incarceration.

The petitioner returned to work two months after the child was born and placed the child in day care at a cost of $250 per week. The respondent did not contribute to the child's day care expenses. In 2011, the petitioner sought child support payments from the petitioner. Although the parties reached an agreement, the agreement was not entered as a court order. The respondent had agreed to pay 25 percent of the child support until he could work more hours at his job, but he never made any child support payments, stating that he had no money. He has provided no support for the child since June, 2012.

At the time of trial, the petitioner and the child lived with the child's maternal grandparents, who helped the petitioner with insurance premium payments, food, and babysitting. The child attended a preschool; the petitioner paid a co-pay and Care for Kids paid the balance of the fee. The petitioner's sister and grandfather also provided care for the child. The petitioner worked at a pharmacy, earning $15.50 an hour, and attended nursing school from which she expected to graduate in Septem-

ber, 2016.

In response to the respondent's motion for articulation, the court stated that, with help, the petitioner meets all of the child's needs. Her future earnings as a nurse will allow her to meet the child's needs with less financial assistance from her parents. The respondent has provided no financial support since the child was six months old, and his future earnings are speculative at best. The child's greatest need is permanency in a placement that affords emotional health and development. The petitioner is meeting his physical, emotional, educational, medical, and moral needs. The child does not know his father, the respondent, and would not recognize him. He has no memories of the respondent. The court concluded that it is in the child's best interest that the respondent be relieved of his financial obligations to the child, an obligation that he has not met since 2012.

The court found by clear and convincing evidence that the respondent had abandoned the child and that he had no ongoing relationship with the child. The court further found by clear and convincing evidence that it is in the child's best interest that the respondent's parental rights be terminated. The respondent appealed and thereafter filed a motion for articulation; see Practice Book § 61-10; which the trial court denied. The respondent then filed a motion for review; see Practice Book § 66-7; which this court granted.

In response to the respondent's request that the court articulate how the child's permanency needs are advanced by terminating the respondent's parental rights, the court repeated its factual findings as to the child's happy temperament, his affectionate relationships with the petitioner, his maternal grandparents and aunt, and his great grandfather. The court also iterated its findings with respect to the child's behavior, personal habits, his relations with other children, his interests, and his excellent verbal skills and vocabulary. The court found that the respondent has played no part in the child's education and social development.

In addition, the court found that the respondent has a troubling, violent criminal history. He was arrested in 2004 in relation to a domestic incident involving his parents; the respondent was convicted pursuant to the arrest. He again was arrested in 2006 because he shot someone and was incarcerated for three and one-half years. Although the respondent was released from prison in 2009, he was arrested again and his probation thereafter was revoked. The respondent was involved in a motor vehicle accident and was found to be in possession of a loaded semiautomatic pistol. Despite his having been convicted of a violent crime in 2004, the court found that the respondent had not changed his violent behavior. He is currently imprisoned and is not expected to be released until 2018.

In 2015, the respondent underwent a psychological evaluation. The court found, on the basis of the psychological report, that the respondent often described his life in vague terms. He tended to portray himself as being unfazed by events in his life, but his capacity to manage his emotions may be significantly underdeveloped. The respondent has a painful personal history, and he is not in good touch with his emotional life. The court did not find the respondent to be a credible reporter. He is not able to manage his aggression and anger, and denies those problems. Although the respondent wants to play a role in the child's life, he is emotionally immature, has poor impulse control, and is insecure. The respondent has a strong desire for a family, which now includes his wife and the son he had with her. During the psychological evaluation, when asked about playing a role in the child's life, *the respondent directed his comments to his own emotions rather than to the child's*.

Consequently, the court found that it may be difficult for the respondent to achieve the goals he sets for himself after he is released from prison. He will not be able to contribute to the child's emotional development at that time. In fact, if he enters the child's life at that point, the child's emotional and intellectual development may turn downward. The respondent cannot manage his own emotions, much less the emotional development of the child. The child's permanency needs are intact and would suffer under the respondent's involvement in his life. By terminating the respondent's parental rights, the child's healthy development will remain on course.

In addressing the respondent's request to articulate facts regarding the child's future need to know about and potentially visit with him and his half brother, and how terminating the respondent's parental rights will advance those needs, the court stated that the respondent has not seen the child since he was six months old and that he has no relationship with the child. Upon release from prison, the respondent plans to resume living with his wife and their son. The petitioner has not informed the child of the respondent, nor has the child seen a photograph of the respondent. He has not asked about his father, who that person might be, and he has not asked why he has not seen his father.

The court found that the respondent has a strong desire to develop a relationship with the child, but his desire may stem more from his need to see himself as being part of a family rather than from a determination to care for the child financially, educationally, and socially. The respondent has not considered the effect on the child if the child's father appeared in his life at the present time.

The court found that for the respondent to develop

a positive relationship with the child, he would have to be out of prison, and established in a stable home and work environment. The respondent would need to have a better understanding of his own emotional deficits and a mature understanding of the emotional needs of his children. The respondent needs time to overcome his own problems to be able to support and care for his wife and their son. It is unlikely that he can soon succeed in establishing himself in his own home with his wife and son, and then establish a positive relationship with the child who does not know him. Moreover, the respondent has not been inclined to participate in counseling to address his own emotional weaknesses. "This is a mountain for a man who will need to find a job with a felony conviction and with no marketable skills."

The court acknowledged that the child may want to know about his father eventually, but he is not inquiring now. By terminating the respondent's parental rights, the court stated, the child will be able to maintain good emotional, intellectual, and social development without being subjected to the respondent's self-centered need to be part of a family unit. In making its findings and reaching its conclusions, the court relied on the testimony offered by the petitioner and Jill Edgar, a licensed clinical psychologist.

The respondent asked the court to articulate why it did not credit the assessment of the Department of Children and Families (department), which did not recommend that the respondent's parental rights be terminated.[2] The court found that a letter from the Office of the Attorney General stated that unless there was an adoptive parent ready to assume financial responsibility for the child, the child stood to lose $60,000 in future support. The reason for the loss of future support was the Department of Social Services' efforts to initiate a support action against the respondent. If the respondent's parental rights were terminated, his financial responsibility also would be terminated. The court found that the department's recommendation not to terminate the respondent's parental rights was based on a financial consideration of the father's future ability to pay support. It was not predicated on the child's financial, physical, educational, medical, and social needs, which were being met by the petitioner and her family. The court stated that it had not discounted the department's reason for its recommendation, but had credited it. It found that the department's reason was solely financial in nature and did not justify, by itself, the recommendation not to terminate the respondent's parental rights.

As to the respondent's request that the court articulate why it did not credit Edgar's assessment that, from the child's perspective, there is no need to decide now whether the respondent's parental rights should be ter-

minated, the court stated that Edgar did not recommend an interactional study between the child and the respondent. Because there is no relationship between the child and the respondent, a first meeting would carry emotionality and strangeness for the child. If such a meeting were to occur, there would have to be considerable preparation for both the respondent and the child to increase the likelihood that the meeting would be positive and not traumatic. Requiring the child to see the respondent for the first time when he was in a prison setting would be highly undesirable.

The court was of the opinion that the child's current healthy development and the lack of a relationship with his father militated against a relationship with the respondent for a number of years. The respondent is eligible to be discharged from prison in 2018 and must establish himself in a law-abiding life. He must develop a father's relationship with his other son and a husband's relationship with his wife, if he is to be successful. He must address his own emotional problems, including feelings of loss, impulse control, anger management, and aggression. The respondent is not inclined to engage in counseling to accomplish this. The court found that the respondent's healthy reintegration into society will take years.

The court analyzed the relevant portion of Edgar's report[3] as follows. Taken in context, Edgar's view that termination of the respondent's parental rights would be in the child's best interest "*if another stable male figure were to adopt*" is time based. (Emphasis in original.) In other words, if a stable male figure were to adopt the child, the respondent's parental rights "*should be terminated*" and such termination would be in the child's best interest. (Emphasis in original.) The court reasoned that in determining whether to terminate parental rights, it need not focus only on whether there are urgent needs that are not being met. If there is an urgent need in this case, it is the need to allow the child to continue his healthy development without the respondent's involvement. The court found that the respondent has no ongoing relationship with the child. It would take years, if ever, for the respondent to develop a healthy relationship with the child. The respondent, however, has not shown an ability to move beyond his own emotional needs to satisfy his desire for a family unit. The respondent's needs do not contemplate the true needs of the child. Since the respondent married in 2013, the petitioner has not made efforts to foster a relationship between him and the child. Neither has the respondent made significant efforts to develop the relationship. The court read Edgar's statements not to mean that parental rights ought not be terminated, but that the child is not in danger of nonpermanency in his current circumstances. Edgar intimates that the respondent's introduction to the child now is not in his best interest and that it would take years, if ever, for

the respondent to become a positive influence in the child's life.

In conclusion, the court found by clear and convincing evidence, pursuant to § 45a-717 (h) (1), that no child care agency was involved in the matter. The child lives with the petitioner, his mother, who has attended to the child's educational, medical, and social needs. The child, who was more than four years old, has affection for and a strong bond with the petitioner, his maternal grandparents and maternal aunt. He would not recognize the respondent and has no bond or contact with him.

The court also found that there were no applicable court orders to be considered. The respondent has made little effort to adjust his circumstances, conduct or conditions, and has made little effort to care for the child's social, educational, emotional and medical needs. The petitioner has not attempted to foster a relationship with the respondent since he married another woman in 2013, and the respondent has not made significant efforts to develop a relationship with the child since that time.

The court found that the petitioner had proven the allegations of her petition to terminate the respondent's parental rights and that it was in the best interests of the child to do so. The court therefore rendered judgment terminating the respondent's parental rights. The respondent appealed.

On appeal, the respondent claims that the court relied on speculation, rather than on evidence in the record, when making factual findings by clear and convincing evidence that it was in the child's best interests to terminate the respondent's parental rights. We disagree.

"In order to terminate a parent's parental rights under § 45a-717, the petitioner is required to prove, by clear and convincing evidence, that any one of the seven grounds for termination delineated in § 45a-717 (g) (2) exists and that termination is in the best interest of the child. General Statutes § 45a-717 (g) (1)." *In re Brian T.*, 134 Conn. App. 1, 10, 38 A.3d 114 (2012). In the present case, the court found that the petitioner had proved two of the statutory grounds: (1) abandonment and (2) no ongoing parent-child relationship. See footnote 1 of this opinion.

"It is axiomatic that a trial court's factual findings are accorded great deference. Accordingly, an appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *In re S.D.*, 115 Conn. App. 111, 116, 972 A.2d 258 (2009).

"We defer to the trier of fact's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. The trier is the judge of the credibility of all the witnesses and the weight to be given their testimony, and may accept, part, all or none of the testimony. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *In re Kamora W.*, 132 Conn. App. 179, 186, 31 A.3d 398 (2011).

"A hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more grounds for termination of parental rights set forth in . . . § 45a-717 (g) (2) has been proven by clear and convincing evidence. If the trial court determines that at least one of the statutory grounds for termination has been proved, then it proceeds to the dispositional phase. . . . In the dispositional phase, there must be a showing by clear and convincing evidence whether termination is in the best interests of the child." (Citations omitted; footnote omitted.) *In re Brian T.*, supra, 134 Conn. App. 11.

In the present case, the petitioner alleged, pursuant to § 45a-717 (g) (2), that the respondent had abandoned the child and that there was no ongoing parent-child relationship between him and the child. The court found that the petitioner had proven both allegations by clear and convincing evidence. The respondent does not challenge the court's findings with respect to the statutory grounds for termination. Rather, he challenges that court's finding by clear and convincing evidence that it is in the best interest of the child to terminate the respondent's parental rights.

"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding [six] factors delineated in [§ 45a-717 (h)]." (Internal quotation marks omitted.) *In re Jaime S.*, 120 Conn. App. 712, 733–34, 994 A.2d 233 (2010), appeal dismissed, 300 Conn. 294, 12 A.3d 566 (2011).

On appeal, the respondent specifically claims that the court made several findings related to his ability to obtain employment when he is released from incarceration. Notably, the respondent points to the court's statement that ready employment is unlikely for him and that finding a job for someone with a felony conviction and no marketable skills would be a mountainous task for the respondent. The respondent claims that there is no evidence in the record to support these findings. We need not determine whether there is no evidence in the record to support the court's findings,[4] as the respondent has failed to demonstrate how those findings are relevant to the criteria by which the court was to determine the child's best interest. In other words, the respondent has failed to demonstrate that, if there was error, why the error was not harmless. Moreover, as the petitioner has pointed out, there is sufficient evidence in the record, which, standing alone, supports the court's finding that termination of the respondent's parental rights is in the child's best interest.

In its memorandum of decision, the court cited the principles of law applicable in termination of parental rights cases. "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding [six] factors delineated in [§ 45a-717 (h)]." (Internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 764, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008).

The court addressed the statutory factors that it was mandated to consider. In its articulation, the court stated, in relevant part: "The child's greatest need is permanency in placement, which affords emotional health and development. [The petitioner] is meeting [the child's] physical, emotional, educational, medical and moral needs." The evidence, which we have reviewed, supports the court's finding that termination of the respondent's parental rights is in the child's best interest. At the time of trial, the child was enrolled in a preschool program for which the petitioner paid that portion of the fee not provided by Care for Kids. The petitioner and the child resided with the petitioner's parents, who provide financial support, insurance, food, and child care. The child visited with his relatives, including his aunt and great grandfather, frequently. A department study, which was placed into evidence, found that the child timely met his developmental milestones and was in good health and was well nourished.

The report also stated that the petitioner was employed and that her monthly salary permitted her to provide for the child's needs. Edgar also found that the petitioner was able to meet the child's needs. The petitioner, with the assistance of her family, with whom she resided, provided the child with permanency and stability, and met his financial, physical, educational, medical and social needs.

The respondent argues that because the child and the petitioner receive certain financial assistance from the state, the court's finding that the petitioner and her family were able to meet the child's medical and financial needs alone is clearly erroneous.[5] The respondent argues that the court's finding is clearly erroneous because it demonstrates that the petitioner did not need any financial contributions from him. The respondent's argument is unpersuasive; he has never made regular financial contributions on behalf of the child, he is presently incarcerated and without funds to support the child, his discharge from incarceration is expected to take place four years after trial, and there is no evidence of the financial support the respondent will be able to contribute when he is released.

The respondent next claims that the court's finding that he will not contribute to the child's emotional development and that the child would suffer if he were involved in the child's life is clearly erroneous. We disagree, as Edgar's psychological evaluation and her testimony support the court's findings. In her report, Edgar stated that the respondent is not in touch with his own emotions to a marked degree, he has little understanding of parenting skills or the potential effect on the child of introducing him to the respondent, particularly while the respondent is in prison,[6] and that he would benefit from psychotherapy as well as a parenting course or counseling. On the basis of her observations of him, Edgar stated that the respondent likely would reject counseling or parenting education. Edgar observed that the respondent has a strong desire to develop a relationship with the child, but that his desire stems more from his own emotional need to be with a family rather than from a more altruistic desire to care for the child. Edgar also opined that the respondent has many unresolved issues of his own and so little grasp of a healthy parent-child relationship that it seems unlikely that the respondent quickly and easily could develop a positive relationship with the child. The respondent has many hurdles to surmount in order to have a positive relationship with the child. On the basis of the foregoing evidence, we conclude that the court's finding that the respondent will not contribute to the child's emotional development is not clearly erroneous.

Finally, the respondent claims that it was clearly erroneous for the court to conclude that "despite the fact that . . . Edgar did not ultimately recommend termi-

nating the respondent's parental rights at this juncture, that '[i]t is clear from the context that . . . Edgar's view is that termination of the [respondent's] parental rights would be in the child's best interest if another stable male figure were to adopt.' " Edgar was of the opinion that, because the child is in a stable, permanent environment, there was no urgent need to terminate the respondent's parental rights. Edgar conceded, however, that an advantage to terminating the respondent's rights at the present time would be that he could not pressure the petitioner to let him see the child. On appeal, the respondent argues that the court prematurely terminated his parental rights.

We disagree with the respondent's claim and concur with the court's conclusion that "considerations in determining whether to terminate parental rights need not focus only on whether there are urgent needs which are not being met. If any need is urgent in this case, it is the need to allow [the child] to continue his healthy development without [the respondent's] involvement." Edgar stated that termination of the respondent's parental rights at the time of trial would be appropriate if there were a stable male figure in the child's life willing to adopt the child. Her opinion, therefore, concerns the timing of the termination of the respondent's parental rights, not whether terminating the respondent's parental rights was not in the best interest of the child.

In a termination of parental rights case, the adjudicatory phase of the case focuses on the parent; the dispositional phase focuses on the best interest of the child. "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. . . . In making that determination, the court must consider the factors delineated in § 45a- 717 (h)." (Citations omitted; internal quotation marks omitted.) *In re Sydnei V.*, 168 Conn. App. 538, 554,      A.3d      (2016).

Section 45a-717 (h) (3), (4), (5) and (6) are applicable in this case.[7] Significantly, the court found that the respondent abandoned the child and that no ongoing parent-child relationship exists between them. The respondent has failed to contribute to the child's financial needs or to play any role in the child's social and educational development. The happy and contented child, who was four and one-half years old at the time of trial, does not know that the respondent is his father, and he does not ask about his father. The respondent is in prison and has made no effort to contact the child or to visit with the child. The respondent lacks employment skills and any means of supporting the child when

he is released from prison, when he must establish himself with his wife and their child. He will need counseling and parenting education before he can be introduced to the child. The respondent must address his own emotional problems, control his impulses, and manage his anger and aggression. He is more focused on his own emotional needs than those of the child. The child is bonded with the petitioner and her family. Those circumstances have enabled the child to develop in healthy and age appropriate ways. His environment is stable and permanent. There is no reason to permit the respondent, upon his release from prison, to disrupt the stability and permanency in the child's life by attempting to intervene to satisfy his own emotional needs.[8]

For all of the foregoing reasons, we conclude that the court properly found that termination of the respondent's parental rights was in the child's best interests. We therefore conclude that the judgment terminating the respondent's parental rights should be affirmed.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** October 26, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 45a-717 (g) provides in relevant part: "[T]he court may approve a petition terminating the parental rights and may appoint a guardian of the person of the child . . . if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) (A) the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . (C) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child . . . ."

[2] The department did not provide services to the child or the petitioner.

[3] Edgar wrote: The child "appears to have a secure, very positive relationship with [the petitioner]. . . . He apparently has . . . positive male role models in his life, in terms of his grandfather and his uncle. Thus, he is not like a child who urgently needs a permanency plan, which can only be developed and implemented if parents' rights are terminated. At this time, it seems that from [the child's] perspective, there is no particular urgency about resolving this issue . . . . If [the petitioner] formed a new relationship with a stable male partner who wanted to adopt [the child], then it might well be in [the child's] best interests not to let further time elapse . . . ."

[4] We note, however, that the trial court's function "is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *In re Christine F.*, 6 Conn. App. 360, 366, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). During the trial, the respondent testified that he had ready employment in the form of four different job offers, including two offers to work as an electrician in a hospital, one offer to work as a carpenter, and to return to his former position at Petsmart. The respondent also testified that he is not a licensed electrician, has no experience doing electrical work, and that he has not spoken to anyone at Petsmart about employment since 2015. On the basis of the respondent's

testimony, the court reasonably and logically inferred that the respondent did not have ready employment at the time he is to be released from incarceration. Contrary to the respondent's argument, the court did not improperly employ a metaphor, "mountainous task," to describe the challenges the respondent faced upon his release from prison.

[5] The respondent also argued that the court's finding that the petitioner's future earnings as a nurse will allow her to meet the child's needs is speculative. In her brief on appeal, the petitioner concedes that there is no evidence in the record to support the court's finding as to her future earnings as a nurse, but she argues that the error is harmless because at the time of trial she was meeting the child's financial needs. We agree.

[6] In his brief on appeal, the respondent did not disagree with Edger that visiting him in prison could be detrimental to the child.

[7] General Statutes § 45a-717 (h) provides in relevant part: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . (3) the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[8] In his brief, the respondent has argued that there are legal remedies available to the petitioner if he attempts to enter the child's life when he is released from incarceration. Litigation, especially child custody battles, are disruptive to a family in any circumstance. This argument again demonstrates the respondent's placing his emotional needs above those of the child.

---